

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>        Recurrido<br><br>            v.<br><br>Fernando Lugo Fabre<br><br>        Peticionario | Certiorari<br><br>2010 TSPR 78<br><br>179 DPR ____ |

Número del Caso: CC-2009-453

Fecha: 25 de mayo de 2010

Tribunal de Apelaciones:

          Región Judicial de Bayamón Panel VIII

Juez Ponente:
          Hon. Carlos Rivera Martínez

Abogada de la parte peticionaria:

          Lcdo. Mark Anthony Bimbela

Oficina de la Procuradora General:

          Lcda. Zaira Z. Girón Anadón
          Procuradora General Auxiliar

Materia: Art. 105 (d) del Código Penal de Puerto Ri    co de 1974

Este documento constituye un documento oficial del    Tribunal Supremo que está sujeto a los cambios y correccione  s del proceso de compilación y publicación oficial de las decisio   nes del Tribunal. Su distribución electrónica se hace como    un servicio público a la comunidad. ?
?
?

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        v.

                           CC-2009-453

Fernando Lugo Fabre

    Peticionario

SENTENCIA

San Juan, Puerto Rico, a 25 de mayo de 2010

El peticionario Fernando Lugo Fabre nos solicita la revocación de una sentencia emitida en su contra por el Tribunal de Primera Instancia, confirmada por el Tribunal de Apelaciones, en la cual se le encontró culpable por el delito de actos lascivos, según estatuido en el artículo 105 (d) del Código Penal de 1974. Luego de examinar la prueba presentada en el juicio y los argumentos de las partes, revocamos a la luz del principio de legalidad. Veamos los hechos que originan esta controversia.

# I.

El 26 de enero de 2006 el Ministerio Público presentó una denuncia en contra del peticionario Fernando Lugo Fabre (Lugo Fabre) por el delito de actos lascivos, según codificado en el artículo 105 (d) del Código Penal de 1974. 33 L.P.R.A. sec. 4067 (derogado). Según la denuncia, el peticionario cometió dicho delito en la persona de N.S.P,[1] consistente en que "utilizando medios engañosos, estando la perjudicada bajo los efectos de la anestesia . . . el acusado le agarró la mano izquierda y se la llevó a su pene ejerciendo presión y movimientos hasta eyacular".

El juicio, por tribunal de derecho, se prolongó por varios días del mes de abril de 2007. Como parte de los procedimientos, declararon diversos testigos, tanto por parte del Ministerio Público como de la defensa, incluyendo al peticionario Lugo Fabre, quien renunció a su derecho a no declarar.[2] Las versiones de los testigos del Ministerio Público y de la defensa sobre lo ocurrido son diametralmente opuestas. No obstante, los testimonios de los que declararon a favor de cada una de las partes son consistentes entre sí, por lo que realizaremos un resumen integrado de dichas declaraciones.

---

[1] A pesar de que N.S.P. es mayor de edad, utilizaremos sus iniciales para proteger su intimidad.

[2] Los testigos por parte del Ministerio Público fueron: N.S.P., su madre Gloria, Dra. Altagracia A. Alcántara González, Agente Jasmine Colón, Dr. Delfín Bernard Echeandía, Leida Rodríguez Vélez, Dra. Yocasta Brugal Mena y Fernando Mercedes Fernández. Por parte de la defensa testificaron: Raquel Rivera Santiago, Lourdes Narváez Espinel, Ida Viera Leguillou y el peticionario Fernando Lugo Fabre.

La señora N.S.P. declaró que el día 23 de abril de 2004 acudió, junto a su madre Gloria, al Advance Imaging Interventional Center a realizarse una biopsia de la glándula tiroides. Indicó que en dicho centro conoció al peticionario Lugo Fabre, quien se identificó como empleado de la institución y la entrevistó para la intervención. Lugo Fabre le informó que no se le podía realizar la intervención ese mismo día, pues N.S.P. no tenía unos estudios de laboratorio recientes, los cuales eran requisito para ese tipo de procedimiento. Por lo tanto, éste le dio una cita para el 28 de abril de 2004. N.S.P. le indicó que ella vivía en el estado de Florida y que regresaba a su hogar el 27 de abril, por lo que le solicitó adelantar la cita. Lugo Fabre consultó con el doctor Delfín Bernard, médico que realizaría la intervención, sobre la situación de N.S.P. Éste indicó que si N.S.P. conseguía los estudios de laboratorio a tiempo, éste podría realizarle la intervención ese mismo día a la 1:00 de la tarde. Lugo Fabre así se lo comunicó a N.S.P., quien estuvo conforme. Lugo Fabre le indicó, además, que para el procedimiento debía traer una almohada y una sábana de su propiedad.

N.S.P. regresó a la hora indicada con los estudios, la almohada y la sábana. Luego de llenar cierta documentación, se cambió de ropa, vistiéndose con una bata desechable, que le proporcionó el laboratorio. El peticionario la preparó para el estudio colocándole unos parchos de monitoreo del corazón en su pecho y un suero en

la mano izquierda. Acto seguido, la llevó donde el Dr. Bernard, quien realizaría la intervención. Éste le indicó que le suministraría una anestesia local que adormecería el área del cuello, pero que la mantendría semi-consciente, para que así pudiera seguir las instrucciones durante el procedimiento. La intervención duró aproximadamente veinticinco (25) minutos y luego fue llevada a un cuarto de recuperación por Lugo Fabre y una enfermera.

En dicho cuarto, fue acostada en un sillón reclinable que estaba localizado en un cubículo rodeado por paredes y una cortina al frente. La acomodaron con su almohada y su sábana. Se sintió un poco mareada, y se quedó dormida. Al rato, sintió que le agarraron su mano izquierda y cuando abrió un poco los ojos, vio a Lugo Fabre quien le puso la mano en su pene erecto y comenzó a masturbarse. Declaró que se quedó paralizada por el miedo y que no pudo gritar, pues no tenía voz, además de sentirse todavía un poco mareada. Indicó que el incidente duró de dos a tres minutos y que Lugo Fabre, al terminar, eyaculó sobre la bata que tenía puesta, su pecho y la sábana con la cual estaba arropada, que había traído de su casa. Expresó que Lugo Fabre salió del cubículo, se lavó las manos y se retiró. Indicó que lo ocurrido fue entre las 2:00 y las 2:30 de la tarde.

N.S.P. continuó declarando que cerca de las 3:00 de la tarde vio a una enfermera de nombre Raquel y le hizo señas para que ésta le cambiara el suero, el cual estaba lleno de sangre, y la ayudara a ir al baño. La enfermera le quitó

el suero, le limpió el área y le puso una curita.  Según lo declarado, la enfermera la llevó al baño y ésta intentó vomitar pero no pudo.  En el baño se limpió su pecho con la bata que tenía puesta, la botó en el zafacón y se cambió de ropa.  Al salir del baño, estaba otra enfermera, de nombre Lissette, quien le indicó que recogiera sus pertenencias, ya que le iban a dar de alta.  No le contó a ninguna de las enfermeras lo sucedido.

Al salir al área de espera, la recibió su madre Gloria.  N.S.P. le dio la almohada y la sábana a su señora madre, quien al tocar la sábana le indicó que estaba mojada y que apestaba a semen, aunque no llegó a decirlo en voz alta en el área de espera, pues N.S.P. le hizo señas – abriéndole los ojos- para que no dijera nada.  Declaró que estando fuera de la institución, su madre le repitió que la sábana apestaba a semen.  N.S.P., sin comentarle nada a su madre, se recostó en su hombro y comenzó a llorar.  Luego se fue a su casa y descansó.  Ese día no le contó nada de lo ocurrido a su madre.

Al otro día, el 24 de abril de 2004, Gloria se disponía a lavar la sábana, y N.S.P. se lo impidió y le indicó que la colocara en una bolsa plástica.  En ese momento le contó lo que le había ocurrido y que no quería lavar la sábana, pues era prueba del suceso. Posteriormente, el 27 de abril de 2004 se comunicó con su abogado, quien la puso en contacto con la doctora Yocasta Brugal Mena, patóloga forense, para que ésta determinara si la sábana contenía semen de Lugo Fabre.  La Dra. Brugal

Mena recibió la sábana en mayo de 2004 y la refirió a la tecnóloga médica Leida Rodríguez Vélez, quien, luego de analizar una muestra de ésta concluyó que, en efecto, el fluido contenido en la sábana era semen.

El 13 de abril de 2005, N.S.P. acudió, en compañía de su abogado, a la Policía para presentar una querella en contra de Lugo Fabre. Fue entrevistada por la Agente Jasmine Colón. N.S.P. realizó una declaración ante la Agente Colón sustancialmente similar a la anteriormente relatada. A preguntas de la Agente Colón sobre la tardanza en reportar lo ocurrido (desde el 23 de abril de 2004 hasta el 13 de abril de 2005), N.S.P. le indicó que se debía a que ella desconocía cómo funcionaba el procedimiento en Puerto Rico, pues era residente del estado de Florida.

La Agente Colón continuó declarando que se reunió con la Dra. Brugal Mena, quien le hizo entrega de la sábana analizada. Posteriormente, en julio de 2005, la Agente Colón citó a Lugo Fabre para entrevistarlo referente a los hechos acontecidos el 23 de abril de 2004. Le indicó que estaba investigando unos sucesos acaecidos en Advance Imaging ese día, pero no le dijo que era relacionado con N.S.P. Le solicitó a éste si podía dar una muestra de sangre, a lo cual éste accedió, luego de consultarlo con su abogado. La Agente Colón llevó la sábana, la muestra ocupada a Lugo Fabre y una muestra bucal de N.S.P. al Instituto de Ciencias Forenses. Con dichas muestras, el señor Fernando Mercedes Fernández, especialista de ADN en el Laboratorio de Criminalística del Instituto, concluyó

que el perfil genético encontrado en la muestra de tela de la sábana correspondía al perfil genético de Lugo Fabre. Es decir, según lo declarado por el Sr. Mercedes Fernández, el semen que había en la sábana pertenecía a Lugo Fabre.

De otra parte, por la defensa declararon cuatro testigos. Las primeras dos testigos, la señora Raquel Rivera Santiago y la señora Lourdes Narváez Espinel, declararon, en síntesis, que laboraban como enfermeras en el centro Advance Imaging para el día 23 de abril de 2004 y que no recordaban haber cambiado un suero infiltrado a N.S.P. Ambas declararon que cuando a un paciente se le infiltra un suero, se realiza un informe de incidente que se hace formar parte del récord del paciente en Advance Imaging y que en este caso no existía dicho informe. La Sra. Lourdes Narváez Espinel declaró, además, que fue quien tomó las anotaciones de los vitales de N.S.P. el día de la intervención, desde las 2:30 hasta las 4:00 de la tarde en intervalos de quince (15) minutos y no vio nada fuera de lo normal. En el contrainterrogatorio declaró, que algunas de las anotaciones pueden tomarse desde un monitor, por lo que no necesariamente se tiene que estar en el área donde se encuentra el paciente para realizarlas.

Por otro lado, como adelantáramos, el peticionario Lugo Fabre renunció a su derecho a no declarar en el juicio y testificó a su favor. Indicó que era enfermero graduado y ostentaba una maestría en anestesia de la Universidad Interamericana de Puerto Rico en Arecibo. Su relato sobre lo ocurrido el 23 de abril de 2004, antes del procedimiento

realizado a N.S.P., es esencialmente similar a lo declarado por ésta en su testimonio. Indicó que luego de terminado el procedimiento, trasladaron a N.S.P. al área de recuperación donde la enfermera Lourdes Narváez y él la atendieron y la conectaron a un monitor cardíaco. Relató que vio a la paciente a las 2:00 de la tarde cuando llegó al área de recuperación y luego de 10 a 12 veces mientras hacía las rondas a los pacientes.

Indicó que observó cuando una enfermera ayudó a N.S.P. a ir al baño, donde ésta se cambió de ropa. Expresó que luego llevó a la paciente afuera, esperó que llegara el vehículo que la recogería y la ayudó a montarse en dicho vehículo. Negó haberse masturbado con la mano de N.S.P.

Continuó declarando que al otro día, esto es, el 24 de abril de 2004, entre las 9:00 y las 10:00 de la mañana, recibió una llamada en Advance Imaging de N.S.P. Ésta le indicó que quería realizarle un obsequio en agradecimiento al trato que se le había brindado el día anterior. Lo citó para que se encontraran en el tercer piso del estacionamiento multipisos del Hospital San Pablo, al lado de Advance Imaging. Declaró que N.S.P. llegó en un automóvil, el cual no recuerda cómo es, y se estacionó frente a la pared hacia el fondo del estacionamiento. Él se acercó por el lado del pasajero, ella lo invitó a entrar en el vehículo y así él lo hizo. Indicó que N.S.P. le regaló un disco compacto de música en agradecimiento a sus atenciones. Siguieron conversando y Lugo Fabre le indicó que estaba concluyendo sus estudios de maestría y que

probablemente se mudaría al estado de Florida al terminar. N.S.P. le dijo que si llegaba a mudarse, que la contactara, que ésta podía ayudarle con la relocalización. Al despedirse, Lugo Fabre le dio un beso en la mejilla, y ésta le correspondió.

Según lo declarado por Lugo Fabre, en ese momento N.S.P. le puso la mano en el muslo y le tocó los genitales, y éste se excitó. Declaró que ésta siguió tocándolo y le ofreció sexo oral, a lo que éste se negó porque no la conocía. No obstante, se bajó los pantalones y aceptó que ésta lo masturbara. Cuando sintió que iba a eyacular, se lo indicó a N.S.P., quien sacó de la parte trasera del vehículo una sábana y se la puso en la base del pene. Declaró que ésta siguió masturbándolo hasta que éste eyaculó y ella lo limpió con la sábana. Declaró que N.S.P. volvió a ofrecerle sexo oral, a lo que éste nuevamente se negó y se despidió de ella. Lugo Fabre concluyó su testimonio indicando que no supo de N.S.P. hasta que recibió un emplazamiento de una demanda que N.S.P. presentó en contra de éste y de Advance Imaging en el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico.

A la luz de la extensa prueba testifical, documental, real y pericial recibida, el Tribunal de Primera Instancia declaró culpable al Sr. Lugo Fabre y lo sentenció a la pena fija de seis (6) años de reclusión, con el beneficio de sentencia suspendida. Inconforme, éste acudió al Tribunal de Apelaciones, alegando que el foro de instancia apreció erróneamente la prueba presentada en su contra. Adujo que

la versión de N.S.P. de lo ocurrido era inverosímil, por lo que no se podía sostener su culpabilidad más allá de duda razonable. En la alternativa, alegó que la sentencia violó el principio de legalidad, pues de los hechos probados no surgió que éste haya engañado de forma alguna a N.S.P. Un panel dividido del Tribunal de Apelaciones confirmó la sentencia apelada, indicando que no encontró error manifiesto, pasión, prejuicio o parcialidad en la apreciación de la prueba por parte del foro de instancia. Dicho foro resolvió, además, que no había problema con el principio de legalidad, pues se probó que Lugo Fabre "valiéndose de su condición de enfermero y del consentimiento médico prestado por [N.S.P.], cometió los actos imputados en el pliego acusatorio" lo que, según su criterio, constituyen los "medios engañosos" requeridos por el delito.[3]

Aún inconforme, el peticionario Lugo Fabre acude ante este Tribunal, presentando los mismos errores que presentó ante el foro intermedio. El 20 de noviembre de 2009 emitimos una Resolución en la cual le ordenamos a la Procuradora General que mostrara causa por la cual no debíamos revocar la sentencia del Tribunal de Apelaciones. La Procuradora General compareció el 27 de enero de 2010 en cumplimiento de nuestra orden. Con el beneficio de su comparecencia, resolvemos según lo intimado.

---

[3] La Hon. Nélida Jiménez Velázquez emitió una Opinión Disidente.

**II.**

Por entender que podemos resolver el presente caso a la luz del principio de legalidad, no atenderemos los errores presentados por el peticionario relacionados a la apreciación de la prueba presentada. En ese sentido, brindamos total deferencia al juicio de credibilidad realizado por el Tribunal de Primera Instancia en este caso. Pasemos entonces a exponer el derecho aplicable a esta controversia.

**A.**

El artículo 8 del Código Penal de 1974 exponía el principio de legalidad. Indicaba dicho artículo que:

> No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido.
> No se podrán crear por analogía delitos, penas, ni medidas de seguridad.

Art. 8 del Código Penal de 1974, 33 L.P.R.A. sec. 3031 (derogado).

El principio de legalidad es una exigencia de seguridad jurídica que requiere que el ciudadano conozca previamente los delitos estatuidos y sus penas correspondientes, además de garantizar que la Rama política representativa del pueblo —la Asamblea Legislativa— sea la que determine los delitos y las penas por las que el Estado puede procesar a un individuo. *Véase* S. Mir Puig, *Derecho Penal Parte General*, Séptima edición, Barcelona, Editorial B de F, 2005, pág. 115. Mediante su formulación se adelantan los siguientes intereses: 1) la limitación de la

arbitrariedad en la aplicación de la ley penal, 2) la separación de poderes, 3) la prevención general y 4) el principio de culpabilidad. L. E. Chiesa Aponte, *Derecho Penal Sustantivo*, San Juan, Publicaciones J.T.S., 2007, pág. 43 citando a C. Roxin, *Derecho Penal; Parte General*, (trad. Luzón Peña), Madrid, Civitas, 2000, págs. 144-47.

En Puerto Rico, el principio de legalidad instaura la garantía de ley escrita, pues no es válido que se inste una acción penal por un hecho que no esté expresamente definido como delito en la ley, lo que elimina la posibilidad de crear delitos a base de jurisprudencia o del derecho consuetudinario. Chiesa Aponte, *op. cit.*, pág. 44; *Pueblo v. Figueroa Garriga*, 140 D.P.R. 225 (1996). Además, y relacionado con lo anterior, se dispone la garantía de ley estricta, lo que prohíbe la creación de delitos y penas por analogía pues "el juez está impedido de penalizar un hecho no tipificado como delito por su semejanza con uno tipificado como tal; o admitir un agravante o una gradación específica no enumerada, basándose en sus semejanzas con una enumerada; o imponer una pena no contemplada por la ley por su analogía con una prevista en la ley". *Pueblo v. Figueroa Pomales*, res. el 30 de octubre de 2007, 2007 TSPR 188, 172 D.P.R. _____ (2007), citando a D. Nevares-Muñiz, *Derecho Penal Puertorriqueño Parte General*, Instituto para el Desarrollo del Derecho, Inc., Primera Ed., Puerto Rico, 1983, pág. 63.

En relación con la prohibición de analogía, hemos expresado que "[l]a analogía conlleva el aplicar la ley a

unos hechos o situaciones no contemplados en [ésta] porque son semejantes o parecidos a los allí contemplados. Al aplicar la analogía, el juez suple la voluntad del legislador, la cual no existe para los hechos que tiene ante sí, basado en su semejanza a los hechos sí tipificados". *Pueblo v. Bonilla Vázquez*, 148 D.P.R. 486, 503 (1999). *Véase también*, *Pueblo v. Barreto Rohena*, 149 D.P.R. 718, 722 (1999); *Pueblo v. González Vega*, 147 D.P.R. 692, 702 (1999); *Pueblo v. Ríos Dávila*, 143 D.P.R. 687, 697 (1997).

Esto, por supuesto, no significa que la ley penal a aplicarse no sea susceptible de interpretación, siempre que la lectura que se realice del texto legal no desborde los límites razonables de tal ejercicio. Mir Puig, *op. cit.*, pág. 124. La diferencia entre una interpretación razonable y la analogía es que mientras la interpretación es una búsqueda de un sentido legal que se halle dentro del "sentido literal posible" del estatuto, la analogía supone la aplicación de la ley penal a un supuesto no comprendido en ninguno de los sentidos posibles de su letra, pero análogo al texto legal. *Id*. El "sentido literal posible" del tipo puede estar influenciado por los precedentes judiciales que hayan interpretado dicho texto legal, siempre y cuando éstos se ajusten al texto claro de la ley. *Pueblo v. González Vega*, 147 D.P.R. 692, 700 (1997); Chiesa Aponte, *op. cit.*, pág. 47. Después de todo, no podemos perder de perspectiva que los estatutos penales deben ser interpretados restrictivamente en lo que desfavorezcan al

acusado, aunque ello no requiere que le demos a un estatuto penal un significado más limitado al que usualmente tiene dentro de la realidad social. *Pueblo v. Figueroa Pomales*, *supra*; Pueblo *v. Sierra Rodríguez*, 137 D.P.R. 903 (1995).

Con lo anteriormente expuesto en mente, pasemos a analizar la modalidad del delito de actos lascivos por el cual fue acusado el peticionario Lugo Fabre, según fue estatuido en el artículo 105 (d) del Código Penal de 1974.

**B.**

El delito de actos lascivos estatuido en el artículo 105 del Código Penal de 1974,[4] en lo pertinente, indica:

> Toda persona que sin intentar consumar acceso carnal cometiere cualquier acto impúdico o lascivo con otra será sancionada con pena de reclusión según más adelante se dispone si concurrieran cualesquiera de las siguientes modalidades:
>
> a)   ….
> b)   ….
> c)   ….
> d)   Si la víctima fuere compelida al acto mediante el empleo de medios engañosos que anulen o disminuyan sustancialmente, sin su conocimiento, su capacidad de resistencia.
> e)   ….
>
> ….

Art. 105 (d) del Código Penal de 1974, 33 L.P.R.A. sec. 4067.

El delito de actos lascivos castiga el que una persona cometa hacia otra cualquier acto impúdico o lascivo, en las

---

[4] El delito de actos lascivos, según estatuido en el artículo 144 del Código Penal de 2004, contiene un lenguaje similar al del artículo 105 del Código Penal de 1974 aquí analizado. *Véase,* Art. 144 del Código Penal de 2004, 33 L.P.R.A. sec. 4772. Por lo tanto, este análisis es aplicable a controversias surgidas a la luz del Código Penal de 2004.

modalidades que el propio delito establece. Un acto lascivo o impúdico es aquel que tiende a despertar, excitar o satisfacer la impudicia, la pasión o los deseos sexuales del sujeto activo. *Véase* D. Nevares Muñiz, *Código Penal de Puerto Rico Revisado y Comentado*, Sexta edición, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2000, pág. 207. Se trata de un delito que ofende el pudor e indemnidad sexual de la víctima, pero se realiza sin la intención de consumar la penetración sexual. *Véase* D. Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, Tercera edición, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2008, pág. 197. El acto puede consistir en el contacto con el cuerpo de la víctima u obligar o inducir a ésta a realizar actos sobre la persona del imputado para excitar o satisfacer los deseos sexuales de éste. *Id*.

El bien jurídico protegido por el delito de actos lascivos es la libertad e indemnidad sexual, pues se busca proteger aquella parte de la libertad referida al ejercicio de la propia sexualidad y la disposición del propio cuerpo. F. Muñoz Conde, *Derecho Penal: Parte Especial*, Decimoquinta edición, Valencia, Editorial Tirant lo Blanch, 2004, pág. 206. En el caso de los menores, puesto que carecen de autonomía para ejercer dicha libertad, lo que se pretende proteger es la libertad futura concretada en la normal evolución y desarrollo de su personalidad; y en los incapaces se busca evitar que éstos sean utilizados como objeto sexual de terceras personas que abusen de su

situación para satisfacer sus deseos sexuales. *Id.*, pág. 207.

El sujeto activo de este delito puede serlo cualquier persona, sin importar su sexo. Nevares Muñiz, *op. cit.* El sujeto pasivo podrá ser igualmente cualquier persona a la cual se le lacere su derecho a la libertad o indemnidad sexual. La acción típica queda definida por el primer párrafo del delito, esto es, cometer cualquier acto lascivo, lo que implica cualquier acto que tienda a despertar, excitar o satisfacer la pasión o deseos sexuales del sujeto activo. Por lo tanto, la definición del acto típico queda inevitablemente atada a la naturaleza de éste, en tanto el mismo pueda considerarse como tendente a excitar o satisfacer el deseo sexual del imputado o imputada, lo cual quedará establecido según las circunstancias de cada caso.

La realización de la acción típica no es suficiente para configurar el delito, si no se cumplen con ciertas circunstancias esenciales establecidas en el tipo. El primer elemento que debe estar presente, aplicable a todas las modalidades, es que el acto cometido no haya sido con la intención de consumar una penetración sexual. En casos en que está presente dicha intención, entonces estaríamos ante la tentativa del delito de violación (hoy agresión sexual). Nevares Muñiz, *op. cit.*, en la pág. 198. Las demás circunstancias necesarias para que se configure el delito surgen de las distintas modalidades de éste, establecidas en el artículo 105. En el caso ante nuestra

consideración, al peticionario Lugo Fabre se le imputó la modalidad (d), esto es, que compelió a la víctima al acto mediante el empleo de medios engañosos que anularon o disminuyeron sustancialmente, sin su conocimiento, su capacidad de resistencia.

Analizando detenidamente la modalidad imputada, la palabra "compeler" significa "obligar a alguien, con fuerza o por autoridad, a que haga lo que no quiere". *Diccionario de la Lengua Española*, Real Academia Española, vigésima segunda edición, 2001, Tomo I, pág. 604. Es decir, que el tipo requiere que el sujeto activo obligue a la víctima al acto lascivo o impúdico, partiendo de que ésta no lo quiera llevar a cabo. La acción de compeler a la víctima debe realizarse **mediante el empleo de "medios engañosos"** que anulen la capacidad de resistencia de ésta, sin que la víctima conozca que la están engañando. De la víctima conocer del engaño, entonces no se configurará la situación típica, pues se entendería que hubo consentimiento y, por lo tanto, no habría laceración al bien jurídico de libertad sexual. Toda vez que la utilización de medios engañosos es un elemento esencial de esta modalidad del delito, debemos delimitar qué constituye "engaño" o "medios engañosos" a los fines de determinar bajo qué circunstancias dicha modalidad se configura.

El artículo 7 del Código Penal de 1974, el cual contiene varias definiciones, no define "medios engañosos" ni "engaño". Dicho artículo, no obstante, define "fraudulentamente o defraudar" como cualquier "acto

cometido mediante ardid, simulación, trama, treta o

**mediante cualquier forma de engaño**".[5] Art. 7 del Código

Penal de 1974, 33 L.P.R.A. sec. 3022 (derogado) (Énfasis

suplido). Por lo tanto, sabemos que "engaño" es, según el

Código, sinónimo de fraude, ardid[6], simulación[7], trama[8] o

treta[9]. Por otra parte, "engañar", según definido por el

diccionario de la Real Academia Española de la Lengua,

significa "dar a la mentira apariencia de verdad" o

"inducir a alguien a tener por cierto lo que no lo es,

valiéndose de palabras o de obras aparentes y fingidas".

Real Academia Española, *op. cit.*, Tomo II, pág. 2068.

Al examinar el significado de "medios engañosos"

debemos igualmente auscultar el propósito que inspiró al

legislador a incluir dicha modalidad en el artículo 105.

La modalidad (d) del artículo 105 fue añadida por el

Proyecto del Senado 257 (P. del S. 257), que luego se

convirtió en la Ley 76 del 9 de julio de 1986 (Ley 76).

Según el historial legislativo de dicha ley, esa modalidad

fue incluida en respuesta a una sentencia no publicada

---

[5] Idéntica definición tiene en el Código Penal de 2004. *Véase* art. 14 (q) del Código Penal de 2004, 33 L.P.R.A. sec. 4642.

[6] Ardid significa "artificio, medio empleado hábil y mañosamente para el logro de algún intento". *Diccionario de la Lengua Española*, Real Academia Española, vigésima segunda edición, 2001, Tomo I, pág. 199.

[7] Simulación es la acción de simular. Simular es "representar algo, fingiendo o imitando lo que no es". Real Academia Española, *op. cit.*, Tomo II, pág. 2068.

[8] Trama significa "artificio, dolo, confabulación con que se perjudica a alguien". Real Academia Española, *op. cit.*, Tomo II, pág. 2208.

[9] Treta significa "artificio sutil e ingenioso para conseguir algún intento". Real Academia Española, *op. cit.*, Tomo II, pág. 2225.

emitida por este Tribunal el 12 de abril de 1983, en el caso de *Pueblo v. Medina Gaud*, Núm. CR-82-14. En ese caso, a un médico se le imputó el delito de tentativa de violación por haber tocado partes íntimas del cuerpo de una paciente de manera lasciva, mientras simulaba realizar un examen vaginal. El antiguo Tribunal Superior encontró culpable al acusado del delito de actos lascivos en su modalidad (b).[10] En aquella ocasión, al emitir una sentencia revocando el fallo de actos lascivos, expresamos:

> En el presente caso no existe esta equivalencia entre los elementos de la modalidad imputada de tentativa de violación y los elementos requeridos por el artículo 105 (b). Esta última disposición está limitada a una disminución de la capacidad de resistencia de la víctima 'a través de medios hipnóticos, narcóticos, deprimentes o estimulantes o sustancias o medios similares'. Estos medios similares no incluyen el engaño por parte del autor, que es esencialmente la actuación alegada en este caso. Este resultado obedece a un defecto en la redacción del estatuto, el cual contiene una laguna que permite que actuaciones como la de este caso no sea castigada como delito de actos lascivos.

Haciendo alusión directa a este pasaje de la sentencia en el caso antes mencionado, la Asamblea Legislativa actuó sobre la laguna que identificamos en la redacción del delito y aprobó la Ley 76 con el propósito de "adicionar el engaño por parte del autor del delito como otra

---

[10] La modalidad (b) del artículo 105 indica que se configurará el delito "[s]i la víctima ha sido compelida al acto mediante el empleo de fuerza física irresistible o amenaza de grave e inmediato daño corporal, acompañada de la aparente aptitud para realizarlo, o anulando o disminuyendo sustancialmente, sin su conocimiento, su capacidad de resistencia a través de medios hipnóticos, narcóticos, deprimentes o estimulantes o sustancias o medios similares". Art. 105 (b) del Código Penal de 1974, 33 L.P.R.A. sec. 4067 (derogado).

circunstancia que debe tomarse en cuenta en la tipificación del delito". *Véase*, Exposición de Motivos de la Ley 76. En la discusión del P. del S. 257 en el seno del Senado, en ocasión de la votación para su aprobación, se dio un intercambio entre el entonces Presidente de la Comisión de lo Jurídico de dicho cuerpo, Hon. Francisco Aponte Pérez y el Hon. Rolando Silva Iglesias, que estimamos conveniente reproducir a los efectos de determinar el entendido que tenía la Asamblea Legislativa al incluir el "engaño" como modalidad de delito.

> Sr. Silva: Señor, Senador, estamos aquí tipificando un delito serio, un delito grave, un delito que conlleva depravación moral y que además de eso, conlleva una pena fija de seis (6) años de presidio. Y estamos tipificándolo por un engaño. **Yo quisiera que el compañero me explique, [¿]qué es lo que estamos legislando, o sea, cuál es el ámbito del engaño que se está legislando aquí en la tarde de hoy?**
> (. . .)
>
> Sr. Aponte Pérez: **La enmienda lo único que quiere, señor Presidente, es suplir la omisión que encontró el Tribunal Supremo en el caso de Medina Gaud.** No estamos extendiendo las consideraciones y los límites de esta enmienda que es meritoria a los casos que menciona el compañero…
> (. . .)
>
> Sr. Silva: Por eso, pero yo lo que quiero es que el compañero me diga, [¿]qué es lo que él entiende por engaño?
> (. . .)
>
> Sr. Aponte Pérez: **Pues, no va mas allá de lo que dijo el Supremo por engaño, punto.**
>
> Diario de Sesiones del Senado de Puerto Rico, 28 de abril de 1986, págs. 2489-2490(Énfasis suplido).

Es decir, que al momento de aprobarse el P. del S. 257, la intención que tuvo la Asamblea Legislativa fue la

de atender situaciones similares a las que enfrentó este Tribunal en el caso de *Pueblo v. Medina Gaud*.  Por lo tanto, lo que la Asamblea Legislativa pretendía castigar era situaciones en las cuales el sujeto activo obtuviera un consentimiento viciado de la víctima para cometer el acto lascivo, induciendo a error a ésta mediante la simulación o la representación falsa de la realización de un acto para el cual la víctima sí prestó su consentimiento.  De tal manera, se consigue sancionar la lesión al bien jurídico libertad sexual, el cual se ve lacerado en tanto su portador consiente a dicho acto a través de las palabras u obras fingidas del sujeto activo en relación con el hecho cometido.

Examinando brevemente el derecho comparado, encontramos que el engaño es igualmente base de responsabilidad penal por delitos sexuales, tanto en la doctrina estadounidense como en la continental. Así, en la doctrina estadounidense, tanto en el delito de violación (rape), como en el de acometimiento o agresión sexual (sexual assault/sexual battery), se castiga la obtención del consentimiento de la víctima a través del engaño, lo que se conocía en el "common law" como "deception" o "fraud".[11]  *Véase* Model Penal Code, secs. 213.1 & 213.4.  En

---

[11] En el Código Penal Modelo, el delito equivalente al artículo 105 de actos lascivos es el acometimiento sexual o "sexual assault".  *Véase*, Model Penal Code sec. 213.4. Dicho delito se configura cuando una persona tiene contacto sexual con otra que no sea su esposa o causa que otra persona tenga contacto sexual con ésta, si se cumple cualquiera de las circunstancias incluidas en el tipo. Contacto sexual está definido como  tocar las partes

general, existen dos tipos principales de fraude o engaño que los estatutos estatales castigan: 1) la simulación de tratamiento médico a la víctima o 2) la simulación sobre la identidad del sujeto activo, normalmente cuando éste se hace pasar como el marido de la víctima. *Véanse,* W. R. La Fave, *Substantive Criminal Law,* Second Edition, Thomson-West, 2003, Vol. 2, sec. 17.3 (c), págs. 628-30; R. M. Perkins & R. N. Boyce, Criminal Law, Third Edition, New York, The Foundation Press, Inc., 1982, pág. 214. En ambos casos, el delito se configura por haberse conseguido un consentimiento viciado de la víctima mediante la simulación realizada por el sujeto activo, sea sobre la naturaleza del acto o sobre su identidad. La premisa básica de la responsabilidad penal bajo dicho delito es que una persona que es engañada sobre la naturaleza del acto que ha de llevarse a cabo no puede dar un consentimiento válido a

---

íntimas o sexuales de una persona con la intención de excitarse o gratificar un deseo sexual. *Id.* Una de las circunstancias a través de las cuales se configura el delito es cuando el sujeto activo conoce que la víctima no tiene consciencia de que se está cometiendo un acto sexual. *Id.* Es en dicha modalidad que el Código Penal Modelo incluye los casos en los cuales se engaña a la víctima para cometer el acto lascivo.

En California, el delito equivalente al de actos lascivos entre personas adultas se conoce como "sexual battery" y es un delito menos grave. Éste consiste, básicamente, del "sexual assault" regulado por el Código Penal Modelo, pero puede ser cometido por cualquier medio, siempre que sea en contra de la voluntad de la persona. *Véase* California Penal Code, sec 243.4(e). Existe una modalidad específica para cuando el acto se comete representándole fraudulentamente a la víctima que el acto se realiza con fines profesionales. *Id.* sec. 243.4 (c). En el caso de actos lascivos hacia menores de edad, se castiga como delito grave, según la sección 288 del Código Penal de California. *Id.,* sec. 288.

dicha conducta. *Véase*, Model Penal Code, sec. 213.4, en la pág. 330.

Por otro lado, en España, antes del Código Penal de 1995, el delito de abusos deshonestos constituía el equivalente a nuestro artículo 105 de actos lascivos.[12] Dicho delito podía configurarse mediando engaño, como una modalidad del delito de estupro.[13] Al comentar sobre dicha modalidad, se dijo que "el abuso deshonesto realizado mediante engaño . . .se caracteriza . . . porque en su ámbito la invalidez del consentimiento se muestra de un

---

[12] El delito de abusos deshonestos establecía que "[e]l que abusare deshonestamente de personas de uno u otro sexo, concurriendo cualesquiera de las circunstancias en el artículo anterior, será castigado con la pena de prisión menor". Art. 430 Cód. Pen. Esp. (1985). El artículo anterior al que se refiere el tipo, lo era el artículo 429 que regulaba el delito de violación, el cual tenía tres (3) modalidades: 1) violación usando fuerza o intimidación; 2) violación de mujer privada de razón o de sentido y 3) violación de mujer menor de doce años. Art. 429 Cód. Pen. Esp. (1985). Un abuso deshonesto consistía en "actos corporales externos contrarios a la moral sexual social que los prohíbe en tales circunstancias de falta de libertad de la víctima", por ejemplo, "la sodomía, la masturbación, los besos, las caricias, [pero no] el yacimiento". F. Muñoz Conde, *Derecho Penal Parte Especial*, Sexta Edición, Sevilla, Publicaciones de la Universidad de Sevilla, 1985, pág. 350.

[13] El estupro se refiere al "yacimiento carnal realizado con virgen o doncella mediante engaño o seducción". Muñoz Conde, *op. cit.*, pág. 353-54. En España, los artículos 434 y 435 castigaban dos tipos de estupros: 1) el de prevalimiento, el cual indicaba que "[l]a persona que tuviese acceso carnal con otra mayor de 12 años y menor de 18, prevaliéndose de su superioridad, originada por cualquier relación o situación, será castigada, como reo de estupro" y 2) el fraudulento, el cual indicaba que "[c]omete, asimismo, estupro la persona que, interviniendo engaño, tuviere acceso carnal con otra mayor de doce años y menor de dieciséis." Art. 434 & 435 Cód. Pen. Esp. (1985). El artículo 436 indicaba que se castigaría con pena de multa "al que cometiere cualquier abuso deshonesto, concurriendo iguales circunstancias que las establecidas en los dos artículos precedentes". Art. 436 Cód. Pen. Esp. (1985).

modo flagrante, en tanto la víctima es llevada a error por el sujeto activo". C. Carmona Salgado, *Los delitos de abusos deshonestos*, Barcelona, Editorial Bosch, 1981, pág. 50. En el nuevo delito de abuso fraudulento,[14] comenta Muñoz Conde que "[p]or engaño habrá que entender, por tanto, cualquier medio fraudulento empleado por el sujeto activo para conseguir la relación, que determine causalmente un vicio de voluntad". Muñoz Conde, *op. cit.*, pág. 227. También se ha expresado que "el engaño consiste en la mendacidad o ardid de que se vale el sujeto activo para que la víctima consienta en el acceso carnal que de otro modo no hubiera permitido. Importa insistir en la necesidad de que el sujeto activo trame la manera de inducir a error a la víctima, y que lo haga con clara conciencia de estar mintiendo . . . precisamente, para alcanzar su propósito". E. Orts Berenguer, *Delitos contra la libertad sexual*, Valencia, Editorial Tirant lo Blanch, 1995, págs. 249-250.

Del estudio realizado, podemos colegir que, tanto en la doctrina continental como en la estadounidense, existe convergencia en cuanto al elemento de engaño en los delitos

---

[14] La regulación de los delitos sexuales cambió con el Código Penal de España de 1995. Ahora existen dos grupos de delitos sexuales: las agresiones sexuales y los abusos sexuales, los cuales se diferencian en que en los primeros interviene la fuerza o la intimidación. Por lo tanto, los antiguos abusos deshonestos pueden ser agresiones sexuales o abusos sexuales, dependiendo de si intervino violencia o intimidación. El abuso deshonesto como modalidad del estupro, que se codificaba en el artículo 436, ahora quedó codificado como un abuso sexual en el artículo 183, el cual castiga con pena de multa al que "interviniendo engaño, cometiere abuso sexual con persona mayor de trece años y menor de dieciséis". Art. 183 Cód. Pen. Esp. (2008).

sexuales. En ambas tradiciones se busca castigar el que se consiga el consentimiento de la víctima a través de simulaciones o representaciones falsas realizadas por el sujeto activo. Igual propósito tuvo nuestra Asamblea Legislativa al incluir la modalidad (d) al artículo 105, según vimos anteriormente. A la luz del texto de la ley, de su interpretación teleológica y del estudio del derecho comparado, podemos entonces concluir que los "medios engañosos" del artículo 105 (d) requieren que el sujeto activo realice una simulación o una representación falsa y mendaz que induzca a error a la víctima y, por consiguiente, ésta consienta al acto lascivo como consecuencia de las actuaciones fraudulentas del autor. El empleo de dichos medios engañosos son los que vician el consentimiento de la víctima "de tal manera que no tiene capacidad sustancial para negarse al acto lascivo o para resistirse al mismo". Nevares Muñiz, *Código Penal de Puerto Rico Revisado y Comentado*, *op. cit.*, pág. 209.

En relación con el tipo subjetivo del delito, éste requiere intención, aunque será suficiente probar que el sujeto ha previsto el resultado como consecuencia probable de su acción o como lo expresa el Código Penal de 2004, que el sujeto activo "ha querido su conducta a conciencia de que implicaba un riesgo considerable y no permitido de producir el hecho delictivo realizado". Art. 23 (c) del Código Penal de 2004, 33 L.P.R.A. sec. 4651. *Véase también*, Art. 15 (b) del Código Penal de 1974, 33 L.P.R.A. sec. 3062 (derogado).

Establecidos los elementos del delito de actos lascivos, según la modalidad (d) dispuesta en el artículo 105 del Código Penal de 1974, pasemos a analizar la prueba presentada por el Ministerio Público en contra del peticionario Lugo Fabre.

**III.**

En el caso ante nuestra consideración, la prueba presentada por el Ministerio Público, creída por el Tribunal de Primera Instancia, estableció que el 23 de abril de 2004 N.S.P. se encontraba en el Advance Imaging recuperándose de una biopsia que se le había realizado en dicho centro. Ésta se había quedado dormida, debido a la anestesia suministrada durante la intervención. La prueba demostró, además, que mientras N.S.P. se reponía de dicho procedimiento, el Sr. Lugo Fabre se acercó a ésta, tomó su mano y comenzó a masturbarse con ella hasta eyacular. No se demostró que N.S.P. haya consentido al acto, pues ésta se encontraba semi-consciente debido a la intervención realizada. Igualmente, se estableció que mientras el Sr. Lugo Fabre realizaba el acto, N.S.P. se sintió atemorizada, razón por la cual no pudo solicitar ayuda. Ante tales hechos, la acción cometida por Lugo Fabre constituyó un acto que satisfizo la impudicia, la pasión y los deseos sexuales de éste, por lo que concluimos que cometió un acto lascivo.

La prueba presentada, no obstante, no estableció que Lugo Fabre simulara realizar otro acto, le hiciera una representación falsa a N.S.P., o la indujera a error de

alguna forma, de modo que viciara su consentimiento al acto. Es decir, el Ministerio Público no probó que Lugo Fabre indujera a N.S.P. a "tener por cierto lo que no lo es", para cometer el delito imputado mediante un consentimiento viciado. De hecho, de la prueba del Ministerio Público no surge que N.S.P. haya consentido de alguna manera al acto, conscientemente o a través de "medios engañosos" como requiere la modalidad imputada. Más bien, lo que fue probado ante el foro de instancia fue que el Sr. Lugo Fabre, sin autorización alguna y sin mediar palabra, se acercó a N.S.P. y realizó el acto por el cual fue hallado culpable.

Siendo así, es forzoso concluir que el Ministerio Público falló en probar un elemento esencial del delito imputado, esto es, que el Sr. Lugo Fabre cometió el delito de actos lascivos mediante el uso de medios engañosos que hayan viciado el consentimiento de N.S.P. al acto. El fallo emitido por la ilustrada sala sentenciadora no puede subsistir, pues el Estado no cumplió con su obligación constitucional de probar más allá de duda razonable todos los elementos esenciales del delito imputado. *Véase*, *Pueblo v. Irizarry Irizarry*, 156 D.P.R. 780 (2002).

La Procuradora General, mediante su escrito en cumplimiento de orden, alega que "no debe de existir ninguna diferencia entre lo acontecido en este caso y el que una persona sea drogada específicamente para estos fines, ya que el bien tutelado es la protección de la integridad y el honor sexual del individuo, quien no está

en posición de consentir al acto . . . . [A]ún cuando el apelante no provocó el estado de inconsciencia de la perjudicada con fines de agredirla . . . éste aprovechó el estado de indefensión de la perjudicada, con pleno conocimiento de ello, para incurrir en conducta delictiva constitutiva de actos lascivos".

A todas luces, la Procuradora General nos invita a que apliquemos por analogía el artículo 105 (d) a lo acontecido en el caso ante nuestra consideración ya que, en su opinión, no existe diferencia entre los hechos probados y el que se drogue a una persona "para estos fines", pues se probó que Lugo Fabre se aprovechó del estado de indefensión de la perjudicada. En primer lugar, la modalidad imputada requiere que el acto lascivo se cometa a través de medios engañosos, no mediante la intoxicación de la víctima con drogas, a diferencia de la modalidad (b) del mismo delito. En segundo lugar, el hecho de que Lugo Fabre se aprovechó del estado de semi-inconsciencia de N.S.P. no implica de forma alguna que éste utilizó medios engañosos para viciar su consentimiento y cometer el acto lascivo. Tomar ventaja de una persona semi-inconsciente y obligarla a realizar un acto sin su consentimiento -casi por la fuerza- no es utilizar medios engañosos que vicien el consentimiento de ésta al acto.

Adoptar la interpretación propuesta por la Procuradora General sería claudicar a nuestro deber de interpretar los estatutos penales a la luz del principio de legalidad y la prohibición de analogía que garantiza el ordenamiento.

Como indicamos anteriormente, tanto el principio de legalidad, como la prohibición de analogía, sirven como límites a la interpretación brindada por los tribunales a los tipos penales, pues estamos impedidos de aplicar la ley a hechos o situaciones no contemplados en el delito imputado por ser semejantes a los allí contemplados.[15] Por lo tanto, declinamos aceptar la invitación intimada por la Procuradora General de acoger una interpretación violatoria del principio de legalidad y la prohibición de analogía.

En virtud de lo anterior, procede revocar la sentencia del Tribunal de Apelaciones que confirmó la sentencia de culpabilidad dictaminada por el Tribunal de Primera Instancia por el delito de actos lascivos, y decretar la absolución del Sr. Lugo Fabre por dicho delito.

**IV.**

Finalmente, antes de poder disponer del caso ante nuestra consideración, debemos examinar si, como cuestión de derecho, la prueba presentada por el Ministerio Público probó más allá de duda razonable la comisión de otro delito menor incluido en el delito de actos lascivos del artículo 105.

---

[15] Si el Ministerio Público entendía que la prueba presentada en contra del Sr. Lugo Fabre era constitutiva de alguna otra modalidad tipificada en el artículo 105, debió solicitar que se enmendara la acusación para que así lo reflejara, utilizando los mecanismos que el ordenamiento le permite. *Véase*, Regla 38 (d) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 38(d). No obstante, luego de emitido el fallo de culpabilidad, no puede solicitar que se aplique analógicamente la modalidad imputada a los hechos probados en el juicio.

En *Pueblo v. Rivera Ortiz*, 150 D.P.R. 457 (2000), resolvimos que el delito de agresión agravada del artículo 95 (d) del Código Penal de 1974 está incluido en el delito de actos lascivos pues "[n]o es posible cometer actos lascivos o impúdicos contra la persona de una mujer sin cometer la agresión que el acto conlleva. Tal agresión o contacto ilegal realizado por un hombre contra la persona de una mujer, sin el consentimiento de ésta, configura precisamente el delito de agresión agravada". *Pueblo v. Rivera Ortiz*, *supra*, pág. 467.

Dicha modalidad del delito de agresión agravada es menos grave, pues establece que la pena de reclusión no excederá de seis (6) meses o una multa máxima de $500. *Véase*, Art. 95 (d) del Código Penal de 1974, 33 L.P.R.A. sec. 4032 (derogado). *Véase también*, Art. 12 del Código Penal de 1974, 33 L.P.R.A. sec. 3044 (derogado). Por otro lado, el artículo 77 de dicho Código establece que una de las razones por las cuales se extingue la acción penal es la prescripción, la cual se computa desde el día de la comisión del delito hasta la fecha en que se expide el mandamiento de arresto o de citación, conforme a la Regla 6 ó 7 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 6 & 7. *Véase también*, Art. 79 del Código Penal de 1974, 33 L.P.R.A. sec. 3413 (derogado). La acción penal para delitos menos graves bajo el Código Penal de 1974, y bajo el actual, prescribe al año, salvo que el delito imputado esté exceptuado de dicho término. *Véase*, Art. 78 del Código Penal de 1974, 33 L.P.R.A. sec. 3412 (derogado). El

delito de agresión agravada del artículo 95 (d) no se encuentra entre los exceptuados, por lo que en su modalidad menos grave prescribe al año de la comisión de éste.

A pesar de que no albergamos duda de que los hechos probados en contra del Sr. Lugo Fabre son constitutivos del delito de agresión agravada en su modalidad menos grave, no podemos devolver el caso al foro de instancia para que se le sentencie por dicho delito, pues la acción penal correspondiente había prescrito al momento en que se le encontró causa probable para arresto por el delito de actos lascivos. *Véase*, *Pueblo v. Oliver Frías*, 118 D.P.R. 285 (1987). Esto es así, pues aun cuando el delito de agresión agravada del artículo 95(d) está incluido en el delito de actos lascivos por el cual se encontró causa probable para arresto conforme a derecho, dicha vista por el delito mayor interrumpe el término prescriptivo para el delito menor incluido, sólo cuando se haya celebrado dentro del término prescriptivo correspondiente al delito menor. *Pueblo v. Oliver Frías*, *supra*.[16] *Véase también*, E. L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*,

---

[16] El Profesor Chiesa lo explica de la siguiente manera: "Aun cuando [agresión agravada menos grave] fuera un delito menor incluido en [actos lascivos], si la acción penal por estos delitos está gobernada por términos prescriptivos distintos, surgiría la prescripción si el tiempo transcurrido entre la comisión del delito y la determinación de causa probable para el arresto por el delito [de actos lascivos], es mayor que el término prescriptivo para la acción penal por el delito [de agresión agravada menos grave]". E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Forum, 1993, sec. 26.2, pág. 248.

Colombia, Forum, 1993, secs. 21.10 & 26.2, págs. 58-62 & 248-251. Eso no ocurrió en este caso.

Los hechos de este caso ocurrieron el 23 de abril de 2004, según los testimonios presentados ante el foro de instancia. No fue hasta el 26 de enero de 2006, que el Ministerio Público presentó una denuncia en contra del Sr. Lugo Fabre por el delito de actos lascivos del artículo 105, encontrándosele causa probable para arresto ese mismo día. Por consiguiente, surge claramente que a esa fecha había transcurrido el término de un año para procesar al Sr. Lugo Fabre por el delito de agresión agravada en su modalidad menos grave, contado desde la comisión del delito hasta la determinación de causa probable para arresto. Por lo tanto, es forzoso concluir que dicha acción penal se extinguió por efecto de la prescripción, por lo que estamos impedidos de ordenar sentenciar al Sr. Lugo Fabre por la comisión de ese delito.

**V.**

En suma, el Ministerio Público falló en presentar prueba sobre un elemento esencial del delito de actos lascivos del artículo 105 (d) por lo que no puede prevalecer el fallo de culpabilidad emitido por el foro de instancia. Por otro lado, el delito menor incluido de agresión agravada en su modalidad menos grave prescribió conforme la discusión antes expuesta. Por los fundamentos antes expuestos, se expide el auto, y se dicta la sentencia revocando el dictamen del Tribunal de Apelaciones y se decreta la absolución del Sr. Fernando Lugo Fabre.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Kolthoff Caraballo disiente con opinión escrita.


                              Aida Ileana Oquendo Graulau
                            Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Recurrido

        v.                        **CC-2009-453**

Fernando Lugo Fabre

    Peticionario


Opinión Disidente emitida por el Juez Asociado señor Kolthoff Caraballo


San Juan, Puerto Rico, a 25 de mayo de 2010.

Respetuosamente, disiento. En primer lugar difiero en cuanto a la apreciación de la mayoría de que la controversia en el presente caso se enmarca a la luz del principio de legalidad. En todo caso, el presente caso requiere interpretar simplemente si la prueba logró demostrar, más allá de duda razonable, uno de los elementos esenciales del delito, en este caso, el engaño.

Por otro lado, y como bien señala la Sentencia de la mayoría, el inciso (d) del Art. 105 del antiguo Código Penal, fue aprobado a raíz de una Sentencia de este Tribunal en el caso de Pueblo v. Medina Gaud, Núm. CR-82-14, que apuntalaba una laguna en este artículo en los

casos en que la víctima fuere compelida (obligada) al acto mediante engaño, y que tal engaño disminuyera sustancialmente su capacidad para consentir. En la referida Sentencia, y citando la propia Sentencia de la mayoría en el caso de autos, "un médico se le imputó el delito de tentativa de violación por haber tocado partes íntimas del cuerpo de una paciente de manera lasciva, **mientras simulaba realizar un examen vaginal**". (Énfasis del que suscribe).

Como vemos, en Pueblo v. Medina Gaud, supra, el engaño consistió en que la víctima permitió el acto lascivo porque se encontraba bajo la creencia de que en realidad le estaban haciendo un examen vaginal. Asimismo, el médico intencionalmente engañó a la víctima haciéndole creer que lo que le realizaba era un acto válido, relacionado con su función como galeno. Considerando lo anterior, entiendo que los elementos de la percepción de la víctima así como la intención del victimario en el caso de autos, son similares a los de Pueblo v. Medina Gaud, *supra*, que provocaron la enmienda al artículo 105 del derogado Código Penal de 1974, introduciendo así el inciso (d) en cuestión.

Como bien concluye la Sentencia de la mayoría, no hay duda de que la acción cometida por el peticionario Lugo Fabre constituyó un acto lascivo. Ahora bien, **¿conocía el peticionario Lugo Fabre que al momento de cometer su fechoría la víctima se encontraría bajo los efectos de una anestesia? Sin duda lo conocía pues él mismo había hecho todos los**

**arreglos de admisión y demás pormenores, hasta dejar a la señora N.S.P. (su víctima) totalmente lista en la presencia del médico que la anestesiaría.**[17] ¿De no conocer el peticionario –como claramente lo conocía – que la víctima se encontraba bajo los efectos de una anestesia, se habría atrevido a cometer el acto lascivo?[18] No me queda la menor duda de que no se hubiera atrevido.

De manera que, en el caso de autos, mientras el médico anestesió a la señora N.S.P. para un procedimiento totalmente lícito, el peticionario Lugo Fabre utilizó intencionalmente tal procedimiento para cometer su fechoría. Sin duda, la señora N.S.P. fue **compelida mediante engaño porque ella prestó su consentimiento al momento de que la anestesiaron para la realización de un procedimiento lícito, mientras Lugo Fabre sabía que lo utilizaría para el acto lascivo. De esta manera, el peticionario indujo a su víctima a "tener por cierto lo [que él sabía] que [no era]".** No hay

---

[17] No pasemos por alto que el peticionario Lugo Fabre es un enfermero graduado con una maestría precisamente en anestesia, por lo que tenía que conocer que el procedimiento para el cual la señora N.S.P. estaba haciendo admisión requeriría anestesia. De hecho la prueba también demostró que fue el propio Lugo Fabre quien transportó a la señora N.S.P., del cuarto donde había ocurrido la intervención lícita del médico, hacía el cuarto de recuperación donde ocurrió el acto lascivo.

[18] El hecho de que la víctima hubiere despertado en medio del acto- aunque en realidad y como señala la Sentencia de la mayoría estaba semi-inconsciente – y que fuera el temor la que le impidiera gritar pidiendo ayuda, no cambia el resultado, pues, al ella despertar de su total inconsciencia, ya el acto se había cometido, aunque el peticionario no había terminado su desagradable actuación.

duda, desde mi perspectiva, que eso constituye el elemento de engaño que exige el referido artículo. Por esta razón, disiento respetuosamente.


Erick V. Kolthoff Caraballo
Juez Asociado