Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br><br>V.<br><br><br>RUBÉN REYES RIVERA<br><br>Apelante | TA2025AP00511 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Criminal Núm.:<br>D IS2024G0004<br>D IS2024G0005<br><br>Por:<br>Art. 130.A C.P. Grave (2012)<br>Art. 133.A C.P. Grave (2012) |

Panel integrado por su presidenta; la Juez Lebrón Nieves, el Juez Pagán Ocasio y la Jueza Álvarez Esnard

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 22 de abril de 2026.

Comparece ante este Tribunal de Apelaciones el señor Rubén Reyes Rivera (en adelante, el apelante o señor Reyes Rivera), mediante el recurso de apelación de epígrafe. En su escrito ante nos, el apelante solicita la revocación de la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala de Bayamón, el 2 de octubre de 2025. Mediante el aludido dictamen, el *foro a quo* condenó al apelante a cumplir cincuenta (50) años de reclusión por haber violado el Artículo 130 (a) del Código Penal de Puerto Rico de 2012, y quince (15) años por haber violado el 133 (a) del mismo cuerpo legal, a ser cumplidos de forma concurrente.

Por los fundamentos que adelante se exponen, se *confirma* la *Sentencia* apelada.

### I

Conforme surge del recurso ante nuestra consideración, el 23 de octubre de 2023, se presentaron dos (2) denuncias en contra el

señor Reyes Rivera, por presuntamente, haber infringido el Art. 130 (a) del Código Penal de Puerto Rico, sobre agresión sexual y el Art. 133 (a) del mismo estatuto, por actos lascivos. Las denuncias se originaron a causa de unos alegados hechos perpetrados en contra de la menor JNFC, entre principios del 2022 y el 30 de septiembre de 2023.

Según se desprende del expediente, el 1 de febrero de 2024, el Tribunal de Primera Instancia determinó causa probable para acusar y para juicio en contra del señor Reyes Rivera. Subsiguientemente, el Ministerio Público presentó dos (2) acusaciones.

Así las cosas, el 4 de diciembre de 2024, el señor Reyes Rivera renunció a su derecho a un juicio por jurado. El juicio por tribunal de derecho se celebró en las siguientes fechas: el 4 de diciembre de 2024, el 28 de enero de 2025, el 12 de mayo de 2025, el 16, 18 y 30 de junio de 2025 y el 14 de julio de 2025.

La prueba documental del Ministerio Público consistió en las siguientes piezas de evidencia:

- **Exhibit 1**: Informe de la Dra. Licha Soler, intitulado *ED Pediatric Evaluation.*

- **Exhibit 2**: Documento con las advertencias Miranda para persona sospechosa en custodia.

- **Exhibit 3**: El informe de investigación de la agente Bernice Acevedo Morales.

La prueba testifical del Ministerio Público incluyó declaraciones de las siguientes personas: Idalia Cosme Vélez, Luis Raúl Otero Cosme, Dra. Nargies Annette Licha Soler, Ninoshka Cosme, Jesús Santos Méndez, Agte. Bernice Acevedo Morales, y la menor JNFC. Por su parte, la defensa no presentó prueba documental ni testigos.

Conforme surge de la *Minuta* del 14 de julio de 2025, tras evaluar la prueba documental y testifical, el Tribunal de Primera

Instancia emitió un fallo de culpabilidad, por infracción a los Artículos 130 (a) y 133 (a) del Código Penal de Puerto Rico, *infra*. Posteriormente, el 2 de octubre de 2025, el Tribunal de Primera Instancia emitió la correspondiente *Sentencia*. Mediante esta, el foro *a quo* condenó al apelado a cumplir las siguientes penas: cincuenta (50) años de reclusión por cometer el delito de agresión sexual y quince (15) años de reclusión por cometer el delito de actos lascivos, ambas penas a ser cumplidas de forma concurrente. También se impuso el pago de la pena especial.

Inconforme con la determinación del foro primario, el 3 de noviembre de 2025, el señor Reyes Rivera presentó una *Apelación Criminal* ante esta Curia. Allí esgrimió los siguientes señalamientos de error:

> **Primer error**: Erró el Tribunal de Primera Instancia al dictar sentencia contra el apelante sin que mediara prueba suficiente, más allá de duda razonable, para sostener una convicción por los delitos imputados, en violación al debido proceso de ley y a la presunción de inocencia garantizada por la Constitución del Estado Libre Asociado de Puerto Rico y la Constitución de los Estados Unidos.

> **Segundo error**: Erró el Tribunal de Primera Instancia en su apreciación de la prueba, incurriendo en error manifiesto y abuso de discreción, lo que redundó en perjuicio sustancial contra el apelante.

Superado varios trámites procesales, y habiéndole dictado términos para comparecer, el Procurador General presentó el *Alegato de el Pueblo de Puerto Rico* el 27 de marzo de 2026. Con el beneficio de la comparecencia de ambas partes, así como de la Transcripción de la Prueba Oral (TPO) y los autos originales del caso, procedemos a resolver el recurso de epígrafe.

**II**

### A. Deferencia al foro primario

En reiteradas ocasiones el Tribunal Supremo de Puerto Rico ha expresado que: "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los

juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos". *Pueblo v. Negrón Ramírez*, 213 DPR 895, 910 (2024). Además, "como regla general, un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad de sustituir las determinaciones del foro primario por sus propias apreciaciones". *Pueblo v. Toro Martínez*, 200 DPR 834, 858 (2018).

Como es sabido, al revisar cuestiones relativas a convicciones criminales "siempre nos hemos regido por la norma a los efectos de que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto". *Pueblo v. Irizarry*, 156 DPR 780, 788-789 (2002). Ver también *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373-374 (2020). Únicamente ante la presencia de dichos elementos o cuando la apreciación de la prueba no concuerde con la realidad fáctica, o ésta sea inherentemente imposible o increíble, es que los foros revisores podemos intervenir con la apreciación de la prueba. *Pueblo v. Santiago*, 176 DPR 133, 148 (2009).

Esta deferencia judicial se debe a que es "el juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, man[i]erismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad". *Pueblo v. De Jesús Mercado*, 188 DPR 467, 478 (2013) citando a *Pueblo v. García Colón I*, 182 DPR 129, 165 (2011). En virtud de lo anterior, se puede concluir que el foro primario está en mejor posición para evaluar y adjudicar la credibilidad de un testigo. *Íd.* en la pág. 479.

### B. La duda razonable y la suficiencia de la evidencia

Según nuestro sistema de enjuiciamiento criminal, toda persona debe ser hallada culpable más allá de duda razonable. Esto es principio consustancial del precepto constitucional que dispone que "[e]n todos los procesos criminales, el acusado disfrutará del derecho [...] a gozar de la presunción de inocencia". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 354. Cónsono con esta disposición constitucional, nuestro esquema procesal penal establece que "[e]n todo proceso criminal, se presumirá inocente el acusado mientras no se probare lo contrario y en todo caso de existir duda razonable acerca de su culpabilidad, se le absolverá". Regla 110 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 110.

Es por ello que, en nuestro sistema de justicia criminal el Ministerio Público tiene la obligación de presentar suficiente evidencia sobre todos los elementos del delito y su conexión con el acusado, a fin de establecer su culpabilidad más allá de duda razonable. *Pueblo v. García Colón I*, supra, pág. 174 (2011); *Pueblo v. Santiago et al.*, 176 DPR 133, 143 (2009); *Pueblo v. Rivera Ortiz*, 150 DPR 457, 462 (2000). Esto constituye uno de los imperativos más básicos y esenciales del debido proceso de ley. *Pueblo v. Irizarry*, supra, 786 (2002); *Pueblo v. De León Martínez*, 132 DPR 746, 764 (1993).

Ahora bien, en múltiples ocasiones el Tribunal Supremo de Puerto Rico ha expresado que tal estándar de exigencia probatoria no significa que el Ministerio Público tiene que presentar prueba que establezca la culpabilidad del acusado con certeza matemática. *Pueblo v. Feliciano Rodríguez*, 150 DPR 443, 447 (2000) citando a *Pueblo v. Cruz Granados*, 116 DPR 3, 21-22 (1984); *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995); *Pueblo v. Pagán Ortiz*, 130 DPR 470, 480 (1992). Lo importante es que la prueba sea suficiente y satisfactoria en derecho. *Pueblo v. Torres García*, 137 DPR 56, 64

(1994). Es decir, se requiere prueba suficiente que "produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. García Colón I*, supra, págs. 175. Véase, además, *Pueblo v. Acevedo Estrada*, 150 DPR 84, 100 (2000).

En este particular, "la duda razonable que acarrea la absolución del acusado no es una duda especulativa o imaginaria, ni cualquier duda posible. Más bien, es aquella duda producto de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso". *Pueblo v. García Colón I*, supra*, pág. 175; Pueblo v. Santiago et al.*, supra, pág. 143; *Pueblo v. Irizarry*, supra, pág. 788. En síntesis, existe duda razonable cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada. En atención a ese principio, los foros apelativos deben tener la misma tranquilidad al evaluar la prueba en su totalidad. *Pueblo v. Casillas, Torres*, 190 DPR 398, 415 (2014).

En *Pueblo v. Casillas, Torres*, supra, nuestra Alta Curia enunció que:

> También se exige que la evidencia conecte al acusado con los delitos imputados, una función eminentemente propia del juzgador de la credibilidad. Dentro de la responsabilidad del tribunal de examinar la suficiencia, este ha de asegurarse de que la prueba de cargo sea una que, de ser creída, pueda conectar al acusado con el delito imputado. *Pueblo v. Casillas, Torres*, supra, pág. 415, citando a *Pueblo v. Colón Burgos*, 140 DPR 564, 581 (1996). (Énfasis suprimido).

Así, la apreciación realizada por el juzgador de los hechos sobre la culpabilidad de un acusado es una cuestión mixta de hecho y de derecho. Por tanto, la determinación de culpabilidad más allá de duda razonable es revisable en apelación como cuestión de derecho. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 472 (1998); *Pueblo v. González Román*, 138 DPR 691, 708 (1995).

De igual forma, en intrínseca relación con el caso ante nos, es harto conocido que las reglas de derecho probatorio permiten que un hecho pueda probarse utilizando evidencia directa. De acuerdo con la Regla 110 (H) de dicho cuerpo normativo, la evidencia directa es aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. 32 LPRA Ap. VI, R. 110 (H). Sabido es, además, que la Regla 110 (D) de las de Evidencia dispone que: "la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho". 32 LPRA Ap. VI, R. 110 (D).

> [E]l testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio, aun cuando no haya sido un testimonio "perfecto", pues "[e]s al juzgador de los hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables. *Pueblo v. Toro Martínez*, 200 DPR 834, 860 (2018), citando a *Pueblo v. De Jesús Mercado*, 188 DPR 467, 476-477 (2013) (Énfasis suprimido).

Por ende, es al juzgador de los hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables. *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995).

### C. *Agresión Sexual*

El delito de agresión sexual se encuentra regulado en el Artículo 130 (a) del Código Penal de 2012, 33 LPRA sec. 5191, el cual lo define como sigue:

> [T]oda persona que, a propósito, con conocimiento o temerariamente lleve a cabo, o que provoque que otra persona lleve a cabo, un acto orogenital o una penetración sexual vaginal o anal ya sea ésta genital, digital, o instrumental, en cualquiera de las circunstancias que se exponen a continuación:
>
> (a)   Si la víctima al momento del hecho no ha cumplido dieciséis (16) años, salvo cuando la víctima es mayor de catorce (14) años y la diferencia de edad entre la víctima y el acusado es de cuatro (4) años o menos.

A su vez, el artículo 132 del Código Penal establece que el "delito de agresión sexual … consiste esencialmente en la agresión

inferida a la integridad física, síquica o emocional y a la dignidad de la persona. Cualquier acto orogenital o penetración sexual, vaginal o anal, ya sea ésta genital, digital o instrumental, por leve que sea, bastará para consumar el delito". 33 LPRA sec. 5193.

La modalidad de la agresión sexual tipificada en el inciso "a" recoge la normativa previa de la violación técnica, la cual le imputa carácter delictivo al acto sexual, sin posibilidad de que medie consentimiento como defensa.[1] Como señala Dora Nevares, "[n]o es pertinente si la persona prestó consentimiento al acto sexual, puesto que, por razón de su inmadurez sicofisiológica, el ordenamiento jurídico no le reconoce capacidad para prestar consentimiento". Dora Nevares-Muñiz, *Código Penal de Puerto Rico Comentado*, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2015, pág. 210. Ver también, *Pueblo v. Chévere Heredia*, supra, pág. 15.[2] En virtud de lo anterior, los elementos de este delito son: (1) un acto orogenital o de penetración sexual ilegal,[3] (2) una víctima menor de 16 años y (3) el estado mental criminal, para lo cual es suficiente la temeridad.[4] Cabe destacar que el delito tampoco requiere que se pruebe el empleo de fuerzo o violencia contra la víctima. *Pueblo v. Pérez Rivera*, 129 DPR 306, 316-317 (1991).

Pertinente a la controversia ante nos, nuestro Tribunal Supremo ha sostenido convicciones por el delito de agresión sexual, aun cuando a raíz de exámenes médicos no se hubiese detectado

---

[1] Esta norma proviene del *statutory rape* del *common law*, la cual entendía que los menores de cierta edad (en sus inicios, diez años) deberían ser considerados incapaces de brindar consentimiento. Para un análisis de este, y su desarrollo en los Estados Unidos, ver LaFave, *Substantive Criminal Law*, 3ra ed., Thomson Reuters, 2018, Vol. II, §17.4(c).

[2] Allí nuestro más alto foro expresó que:
> [L]o verdaderamente medular entre los elementos del delito de violación técnica es el acceso carnal con una menor de catorce (14) años ... por lo que la forma como la relación sexual ocurrió y cualesquiera otros detalles —tales como si hubo violencia o no, si hubo consentimiento o no, y los sentimientos de la víctima hacia sus agresores— carecen de pertinencia para determinar la configuración de la conducta criminal.

[3] Fuese digital, genital o instrumental.

[4] Se omite la excepción que establece el propio artículo 130, en casos donde la víctima sea mayor de catorce (14) años y la diferencia en edad con el victimario sea menor de cuatro (4) años.

laceraciones o semen en el cuerpo de la víctima. *Íd.* Del mismo modo, se ha determinado que la eyaculación o presencia de semen en la vagina de la víctima no es elemento constitutivo de la violación. *Íd.* En torno al aspecto físico de la violación, "bastará para consumarlo cualquier penetración sexual por más leve que fuere". *Pueblo v. Rivera Robles*, 121 DPR 858, 873 (1988).

Ante la ausencia de prueba física, el elemento de acceso carnal se puede demostrar más allá de duda razonable mediante otro tipo de prueba, tal y como las declaraciones de la víctima a sus familiares en tiempo contemporáneo a los hechos, así como otros testimonios de corroboración ofrecidos. *Pueblo v. Pérez Rivera*, supra, pág. 317. Finalmente, nuestro Tribunal Supremo ha establecido que, en casos de agresión sexual, no se requiere prueba corroborativa del testimonio de la víctima. *Comisión Asuntos de la Mujer v. Srio. de Justicia*, 109 DPR 715 (1980).

### D. Actos lascivos

El artículo 133 (a) del Código Penal tipifica el delito de actos lascivos cuando la víctima es menor de 16 años. En específico, reza el articulado:

> Toda persona que, a propósito, con conocimiento o temerariamente, sin intentar consumar el delito de agresión sexual descrito en el Artículo 130, someta a otra persona a un acto que tienda a despertar, excitar o satisfacer la pasión o deseos sexuales del imputado, en cualquiera de las circunstancias que se exponen a continuación …
>
> (a) Si la víctima al momento del hecho es menor de dieciséis (16) años de edad. 33 LPRA sec. 5194.

Este delito "castiga el que una persona cometa hacia otra cualquier acto impúdico o lascivo, en las modalidades que el propio delito establece". *Pueblo v. Lugo Fabre*, 179 DPR 125, 135 (2010). En fin, "trata de un delito … que ofende el pudor e indemnidad sexual de la víctima pero se realiza sin ánimo de acceso o penetración sexual". Nevares-Muñiz, *op. cit.*, pág. 218. Por ende, los elementos

para la comisión de este delito son: (1) que se someta a una persona a un acto que tienda a despertar, excitar o satisfacer la pasión o deseo sexual del imputado, (2) sin que haya intención de cometer el delito de agresión sexual, (3) y estando presente una de las circunstancias concomitantes que establece el artículo (en el caso del inciso "a", que la víctima sea menor de 16 años). *Íd.*

En el caso donde la víctima es menor de edad, "puesto que carecen de autonomía para ejercer dicha libertad, lo que se pretende proteger es la libertad futura concretada en la normal evolución y desarrollo de su personalidad…". *Pueblo v. Lugo Fabre*, supra, en la pág. 136. Cónsono con el fin perseguido por este delito, la ley no requiere que el estado pruebe que la víctima no consintió, puesto que, por su edad, se considera incapaz para ello. Nevares-Muñiz, *op. cit.*, pág. 219.

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a resolver.

### III

El señor Reyes Rivera esgrimió dos señalamientos de error, mediante los cuales alega que no medió prueba suficiente para sostener la condena y que el foro primario erró en su apreciación de la prueba. Por estar estrechamente relacionados, los discutiremos en conjunto. Adelantamos que no le asiste la razón; veamos.

Los señalamientos de error del apelante nos obligan a reexaminar la prueba desfilada en el juicio obrando siempre desde el marco de la debida deferencia que ameritan las determinaciones del foro primario. Por ello, procederemos a reseñar la prueba que tuvo ante su consideración el foro *a quo*.

Aunque la acusación señala que los hechos se remontan a los inicios del 2022, la prueba desfilada demostró que la conducta delictiva comenzó aproximadamente a inicios del 2021. Esto porque, según el testimonio de la agente Bernice Acevedo Morales (agente

Acevedo Morales), la menor JNFC le indicó que estos sucesos ocurrían desde que cumplió sus seis años.[5]

De los testimonios de la señora Idalia Cosme (la abuela de la menor) y Ninoshka Cosme (madre de la menor), surge que la menor JNFC, junto a sus dos hermanos menores, se quedaban en el apartamento de Idalia cada dos a tres semanas.[6] La señora Idalia Cosme vivía en un condominio con el apelante para las fechas señaladas.[7] Según las notas que tomó la agente Acevedo Morales de su entrevista a la menor, el apelante agredía a la menor "casi todas las veces que [JNFC] se quedaba en casa de su abuela".[8] Por ende, la prueba demuestra que, desde inicios del 2021, el apelante agredía a la menor, cuando esta se quedaba a pernoctar en su residencia.

¿En qué consistían las agresiones del señor Reyes Rivera hacia la menor? En su testimonio, la menor JNFC le narró al tribunal lo que ella describió como "las cosas malas" que sucedían en casa del señor Reyes Rivera.[9] Ella contó cómo el apelante "me besaba … en la boca … en el cuarto"[10] y "me ponía el dedo en la vulva … en el cuarto … en la esquina que dormía mi abuela". Específicamente, la menor indicó que, mientras estaba acostada jugando con su tableta, el apelante le ponía el pene en el ano.[11] Asimismo, narró cómo después de que le ponía el pene en el ano, le ponía la lengua en el área genital.[12] A preguntas de cómo lo hacía, la menor indicó que le "bajaba los panties".[13]

A preguntas del Ministerio Público sobre dónde estaba la abuela cuando sucedían estas cosas, la menor respondió:

---

[5] TPO, pág. 376, líneas 16-24 y pág. 377, líneas 1-23. Por su lado, la menor testificó que todo comenzó luego de su cumpleaños con la temática de *Harley Queen*, aunque no se pudo corroborar *de facto* que este fuese su cumpleaños número seis. Ver TPO, pág. 490, líneas 1-5.
[6] TPO, pág. 108, líneas 21-24; pág. 109; pág. 283.
[7] TPO, pág. 100, líneas 9-11.
[8] *Exhibit 3*, pág. 4.
[9] TPO, pág. 475, líneas 5-7.
[10] TPO, pág. 475, líneas 23-24; pág. 476, líneas 1-4.
[11] TPO, pág. 477, líneas 9-17; pág. 479, líneas 16-17.
[12] TPO, pág. 481.
[13] TPO, pág. 482, línea 2.

R Estaba... estaba en la sala.
P ¿Siempre estaba en la sala?
R No, a veces estaba en el cuarto.
P ¿En qué cuarto?
R En el que estaba *(...ininteligible)*.
P Y cuando abueli estaba en ese cuarto, ¿Rubén hacía eso que tú dijiste?
R Este, sí.
P ¿Qué hacía Rubén cuando abueli estaba en el cuarto?
R Pues él sola... solamente me tocaba la vulva.[14]

La menor continuó narrando "las cosas malas" que el apelante le hacía. Esta narró, por ejemplo, que "él me besaba y también ponía su lengua en mi ano".[15] También que "me lo ponía ... me lo ponía en la boca".[16] A su vez, la menor narró que el apelante se eyaculaba dentro de su boca, y que esta escupía en una toalla que el apelante le ponía en la esquina de la cama.[17]

A preguntas de la defensa sobre si cuando ella jugaba con la tableta se encontraba sola, la menor contestó que no.[18] La menor también reafirmó que había tardado en divulgar lo que le sucedía, porque temía que la castigaran y que su victimario fuera preso.[19] A su vez, indicó que los actos dejaron de suceder luego de que ella habló con su abuela Idalia.[20]

En el redirecto, se dio el siguiente intercambio, que reproducimos *verbatim*:

P: [JNFC], a preguntas de la licenciada dijiste, contestaste falso a la premisa de que la mayoría del tiempo estabas en el cuarto jugando con la *tablet*, sola. ¿Por qué eso es falso?
R: Porque yo estaba con Rubén.[21]

Como surge del testimonio de JNFC, hubo una fecha en que la menor le contó lo sucedido a su abuela, la señora Idalia Cosme,

---

[14] TPO, pág. 482, líneas 16-24; pág. 483, líneas 1-3.
[15] TPO, pág. 484, líneas 10-11.
[16] TPO, pág. 487, líneas 2-11.
[17] TPO, pág. 489.
[18] TPO, pág. 507, líneas 9-13.
[19] TPO, pág. 515.
[20] *Íd.*
[21] TPO, pág. 517, líneas 21-24 y pág. 518, líneas 1-2.

desde la cual cesaron las agresiones en su contra. La señora Idalia Cosme testificó que esto fue el 21 de octubre de 2023.[22]

Esta comenzó narrando que, la noche del 21 de octubre de 2023, ella fue y recogió a sus tres nietos, hijos de Ninoshka Cosme, a quienes iba a cuidar.[23] Ella detalla que, al entrar al apartamento, se percató que la menor JNFC se quedó cerca detrás de ella.[24] Idalia contó que la menor le dijo que tenía que decirle algo importante. Aunque Idalia primero le dijo que le diera una oportunidad para usar el baño, la menor siguió con ella. En particular, dijo:

> R: Cuando llegamos al baño, ella me dice *"abueli, tengo que hablar algo bien importante contigo."* Y yo *"dame un break en lo que…"*, pero se metió. *"Que tío Luis no lo sepa, porque me regaña."* Pues entonces yo cerré la puerta del baño y le dije *"dime ahora".*[25]

Una vez encerradas en el baño, la menor procedió a narrarle a Idalia que el apelante le hacía "cosas que a ella no le gustan".[26] En específico, Idalia relató que la menor le dijo que "me toca aquí", señalándose la región genital y que "me lo pone en la boca", refiriéndose al pene del apelante.[27] Posterior a este intercambio, testificó Idalia que:

> R: Pues por el momento, pues, como que me quedé en el *shock*, no podía creer que lo que ella me estaba diciendo. Y de ahí ella sale y me dice *"abuela, me tienes que creer, porque te estoy diciendo la verdad".*[28]

Acto seguido, Idalia narró que se llevó a los menores al supermercado.[29] Al salir del establecimiento, y previo a dirigirse nuevamente al apartamento, Idalia llamó a Ninoshka Cosme. En esa llamada, Idalia le indicó a Ninoshka que tenía que regresar al hogar,

---

[22] TPO, pág. 98.
[23] TPO, pág. 98.
[24] TPO, pág. 100, líneas 12-22.
[25] TPO, pág. 100, línea 24, y pág. 101, líneas 1-5. El texto en bastardillas se encuentra en la transcripción enmendada, sin que se entienda que tenga un énfasis añadido.
[26] TPO pág. 101, líneas 16-20.
[27] TPO, pág. 101, línea 24, y pág. 102, líneas 1-2.
[28] TPO, pág. 102, líneas 14-18. El texto en bastardillas se encuentra en la transcripción enmendada, sin que se entienda que tenga un énfasis añadido.
[29] TPO, pág. 102, líneas 18-24.

"que había que hablar algo".[30] Según el testimonio posterior de Ninoshka, en ese momento Idalia no le reveló lo dicho por la menor, pero le insistió en que tenía que regresar al hogar.[31]

El testimonio de Idalia continúa situándolos nuevamente en el apartamento del apelante.[32] Allí llegó Ninoshka con su pareja Jesús Santos, quienes ascendieron al apartamento donde estos se encontraban.[33] Al entrar, Ninoshka se llevó a la menor al balcón del apartamento, donde dialogó a solas con ella.[34]

Una vez a solas con la menor, Ninoshka le preguntó a su hija qué estaba pasando, quien responde inicialmente que llevaba tiempo que quería hablar con su abuela, y luego le cuenta que el apelante le hacía cosas que no le gustaban.[35] Cuando Ninoshka le inquirió sobre qué cosas le hacía, "ella dijo le tocaba la vulva y se señaló … se señaló sus partes".[36] Acto seguido, testificó Ninoshka que "yo le pregunté que por qué ella no me había dicho nada, y ella dijo que... porque Rubén le había dicho que a él lo iban a meter preso y a ella le iban a castigar".[37]

Cuando Ninoshka y la menor terminaron de dialogar, Idalia se fue al balcón.[38] Al ver que habían terminado de hablar, Idalia testificó que le indicó a la menor que fuera al cuarto de ella (del apelante e Idalia), y luego, le dijo al apelante que fuera allí también.[39] En ese preciso momento, se encontraban en el cuarto: el apelante, la menor JNFC, Idalia y Ninoshka; Jesús Santos (la pareja de Ninoshka) se quedó en la sala del apartamento con los dos restantes hijos de Ninoshka.[40]

---

[30] TPO, pág. 103, líneas 22-23.
[31] TPO, pág. 284, líneas 10-24; pág. 285, línea 1.
[32] TPO, pág. 104.
[33] El condominio quedaba en un piso veinte. Ver TPO pág. 100, líneas 1-3.
[34] TPO, pág. 104.
[35] TPO, pág. 287.
[36] TPO, pág. 287, líneas 7-12.
[37] TPO, pág. 287, líneas 15-18.
[38] TPO, pág. 104, línea 22.
[39] TPO, pág. 104, líneas 23-24.
[40] TPO, pág. 105, líneas 4-12.

Allí en el cuarto, le pidieron a la menor a que le dijera al apelante lo que le había manifestado tanto a su mamá como a su abuela.[41] Según el testimonio de Idalia, la menor le dijo al apelante que le "hace cosas que a ella no le gustan" y "la toca ahí, en la vulva".[42] Cabe señalar que el testimonio de Ninoshka, en cuanto a qué expresó la menor en el cuarto, es ligeramente distinto. Esta testificó que:

> De ahí mami le pregunta a Jayliannie qué cosas le hacía Rubén y Jayliannie dijo que él le toca… que le hacía cosas que no le gustaban, que le tocaba las partes y que le lambía… que llegó a lamber sus partes y le… este, le puso las partes de él en la boca.[43]

Al ser confrontado por la menor, el apelante quedó sorprendido, y, según testificó Idalia, indicó que llamaran a la Policía.[44] Ante las aparentes negaciones del apelante de haber actuado según se le imputaba, narró Idalia que: "[p]ues ahí viene [la menor] y le dice que qué quiere decir, que si él no hizo eso, como molesta".[45] Este testimonio fue corroborado por el testimonio de Ninoshka.[46]

Al escuchar este intercambio, Ninoshka contó que se retiró del apartamento con sus tres hijos y su pareja.[47] Un tiempo luego, Idalia salió hacia la casa de Ninoshka.[48] Al llegar a su propia residencia, la menor se fue con Jesús Santos aparte, mientras que Ninoshka descendió al estacionamiento a recibir a su madre.[49]

Jesús Santos, quien era la pareja sentimental de Ninoshka Cosme, testificó que, al arribar a la residencia, este le preguntó a

---

[41] TPO, pág. 105, líneas 15-16. Ver también TPO pág. 288, líneas 22-24; pág. 289, líneas 1-3.
[42] TPO, pág. 105, líneas 15-18, 20.
[43] TPO pág. 288, líneas 22-24; pág. 289, líneas 1-3.
[44] TPO, pág. 106.
[45] TPO, pág. 106, líneas 16-18.
[46] TPO, pág. 290, líneas 9-14.
[47] TPO, pág. 289, líneas 12-13. Ver también TPO, pág. 106, líneas 20-22 (el testimonio de la Sra. Idalia Cosme a los fines de señalar que Ninoshka se fue con la menor luego de este intercambio).
[48] TPO, pág. 107.
[49] TPO, pág. 291; pág. 107, líneas 10-13.

JNFC si deseaba hablar sobre lo sucedido, a lo cual esta accedió.[50]

Es ahí cuando estos se reubican a dialogar en uno de los cuartos de la residencia, mientras que Ninoshka descendió al estacionamiento. Jesús testificó que:

> Entonces, ella me dice que Rubén le hacía cosas malas. Entonces, yo le pregunté que qué cosas malas le hacía y me dijo que Rubén se quitaba la correa, se bajaba los pantalones y le ponía sus partes privadas en la boca. Entonces, después me dijo que la besaba, este, que, este, la tocaba y que intentó penetrarla por al frente y por atrás. Entonces yo le pregunté que qué ella sintió cuando intentó por atrás, me dijo que le dolió y lo empujó. Entonces yo le dije que me tenía que decir la verdad, pa' poder ayudarla, porque eso es muy delicado. Ella me dijo que sí, que todo era verdad. Entonces ahí yo le digo: *"Pues nada, este, estate tranquila, vete a acostarte, que yo voy a hablar con mamá pa' ver qué vamos a hacer"*.[51]

Además, la menor le relató a Jesús que los sucesos le ocurrían mientras esta se encontraba en el cuarto del apelante.[52] Una vez culminada la conversación, Jesús le dice a la menor que se acueste y sale a la sala. Estando Jesús en la sala, la menor salió a donde él y le dice que "no puede dormir, porque se sentía culpable, porque Rubén le decía que[,] si decía todo lo que estaba haciendo, a él lo iban a meter preso y a ella le iban a castigar",[53] a lo cual Jesús le respondió que hacía lo correcto, y la llevó al estacionamiento de la residencia, donde estaban Ninoshka e Idalia.[54]

Una vez allí, la menor se montó en el asiento trasero del carro, por el lado del conductor. Los cuatro, en ese instante, se encontraban dialogando por el lado del conductor del auto: Idalia, en el asiento del conductor; la menor, en el asiento posterior; y Jesús y Ninoshka, parados afuera.[55] Testificó Idalia que, en ese momento, "[e]lla llegó, ehh así mismo me dijo, *"él también me lambió ahí"*,

---

[50] TPO, pág. 330.
[51] TPO, pág. 331, líneas 2-17. El texto en bastardillas se encuentra en la transcripción enmendada, sin que se entienda que tenga un énfasis añadido.
[52] TPO, pág. 332, líneas 1-3.
[53] TPO, pág. 332, línea 21 y 24; pág. 333, líneas 1-2.
[54] TPO, pág. 333.
[55] TPO, pág. 292, líneas 3-17.

mientras se señalaba su región genital".[56] Por su parte, Ninoshka narró que la menor les compartió que "adicional de que le tocaba las partes, este, que él le... que, este, le lamía el totin, porque... este, él intentó ponerle sus partes en la parte de atrás y le dolió". [57] Además, "[e]lla decía que era cada vez que ella iba a su casa, se quedaba en su casa", refiriéndose a la residencia del apelante.[58] Con esa información, Ninoska decidió acudir al cuartel.[59]

Cuando Ninoshka partió hacia el cuartel, Idalia regresó al apartamento del apelante.[60] Estando en el cuartel, aunque no especificado en qué momento, Ninoshka testificó que la menor le confesó sentirse mal por haber roto "un trato de no decir nada, que tenía con Rubén".[61]

Por otro lado, Idalia testificó que regresó a donde estaba el apelante y le instruyó a "que se vista, que íbamos pal cuartel".[62] Todas las partes llegaron al cuartel. Una vez allí, Jesús testificó que el apelante le pidió que saliera a dialogar con él.[63] Narró Jesús que:

> R    Pues Rubén me dice que... que él no sabía por qué Jayliannie estaba diciendo esas cosas, que yo sabía cómo él era con los nenes, que siempre él... siempre estaban sus dulces en la nevera, que siempre él los trataba bien. Y yo le dije que... que se estuviese tranquilo, que para eso estamos aquí, pa'... pues, pa' llegar al fondo de todo, pero que en verdad yo le creía a Jayliannie. Y él me dijo que... que estaba bien, que él admiraba a Ninoshka por... por ir al cuartel, que está haciéndolo super bien, y que, pues, que si lo tenían que meter preso, que lo metieran, pero que averiguaran bien, tú sabes, que investigaran bien.[64]

Una vez culminados los trámites en el cuartel,[65] la familia llegó al Puerto Rico Woman and Children's Hospital la madrugada

---

[56] TPO, pág. 108, líneas 7-8.
[57] TPO, pág. 292, líneas 20-24.
[58] TPO, pág. 293, líneas 20-21.
[59] TPO, pág. 108. Ver también, TPO pág. 293.
[60] TPO, pág. 116.
[61] TPO, pág. 296, líneas 16-19. Por otro lado, durante el contrainterrogatorio, Ninoska testificó que la menor realizó dichas expresiones cuando habían salido de la residencia del apelante; ver TPO pág. 315.
[62] TPO, pág. 116, líneas 21-23.
[63] TPO, pág. 335, líneas 23-24 y pág. 336, línea 1.
[64] TPO, pág. 336, líneas 3-16.
[65] Los testimonios vertidos en el juicio no brindan detalles adicionales sobre cómo fueron los trámites en el cuartel. Tampoco testificó el agente interventor.

del 22 de octubre de 2023. Estando allí, luego de pasar por el proceso inicial de cernimiento (triage) con el Departamento de Enfermería, fueron atendidos por la doctora Nargies Licha Soler (Dra. Licha Soler o doctora).[66] La doctora indicó que, en primer lugar, entrevistó a Ninoshka, la mamá de la menor, quien le explicó el porqué de la visita.[67] La doctora sintetizó su entrevista del siguiente modo:

> La mamá me explicó, pues, que la menor en ocasiones se quedaba a cuidar con su abuelita y que se quedaba la noche en casa de su abuelita. Que ella en el día anterior, o sea, el sábado en la noche, la había llevado a casa de la abuelita a hacer [*sic*] cuidada allá, y que aproximadamente una o dos horas luego de haberla llevado, la abuelita la llamó que la fuera a recoger. Que cuando ella le preguntó por qué, pues ella le dijo, pues, que la niña le había dicho a la abuelita, pues, que la pareja de la abuela, cuando ella se quedaba allá, la tocaba en sus partes privadas y la besaba. Ehh y entonces mamá la recoge, le pregunta qué fue lo que pasó y la niña le dijo lo mismo, que esta persona pues la tocaba en sus partes privadas y la besaba, y que ella le había dicho ya que se parara, pero que cada vez que se quedaba en casa de abuelita, pues que eso pasaba.[68]

Una vez culminada la entrevista con la mamá, la doctora procedió a entrevistar a la menor, JNFC, quien igualmente le contó que el apelante la tocaba en sus partes privadas y la besaba.[69] Además, la menor añadió que el apelante "en ocasiones se había quitado su ropa ... y había estado desnudo enfrente de ella".[70] Culminadas ambas entrevistas, la Dra. Licha testificó que procedió a realizar el examen físico de la menor. Mediante su estudio, identificó en el área genital de la menor "un enrojecimiento del área y [que] había una lesión de un punto rojo en la labia menor izquierda".[71]

---

[66] TPO, pág. 258, líneas 16-21.
[67] TPO, pág. 260, líneas 5-8.
[68] TPO, pág. 260, líneas 15-24; pág. 261, líneas 1-10.
[69] TPO, pág. 261, líneas 4-7.
[70] TPO, pág. 261, líneas 13-17.
[71] TPO, pág. 262, líneas 18-20.

Cuando el Ministerio Público le preguntó qué pudo haber causado lo observado, la doctora contestó "muchas cosas".[72] Cuando se le solicitó que cualificara qué pudieran ser "muchas cosas", la doctora explicó que pudiera incluir "[d]esde limpiarse con el papel de inodoro fuerte y lastimarse el área, hasta una caída que haya tenido alguna lesión en esa área, o también puede ser signos de un abuso sexual".[73] Culminado el examen físico, se sometió a la menor a exámenes de laboratorio.[74] La totalidad el examen realizado quedó plasmado en el documento intitulado *ED Pediatric Evaluation.*[75]

En ese documento, la doctora preparó un narrativo, sintetizando tanto lo contado por Ninoshka, como por la menor. Particularmente, recoge este informe que:

> When I interviewed patient she told me that Rub[é]n Reyes had kissed on mouth and she did not like it, she had told him to stop, but he continued to do it everytime [*sic*] she was at grandmother's house. She also said that he touched her private area and that he sometimes took his clothes off with her.[76]

El informe también indica que la menor tenía una lesión menor de un (1) centímetro en la labia izquierda menor.[77] Esta lesión era "sugestiva de posible abuso, pero pudiera también ser debido a otros factores".[78] Además, indica el documento que la menor no tenía otras lesiones para la fecha.[79] Finalmente, la Dra. Licha Soler no refirió a la menor a un ginecólogo.[80]

Tanto la defensa como el Juzgador de instancia inquirieron sobre el razonamiento detrás de la determinación de no referir al caso a un médico especializado. La Dra. Licha Soler razonó que "en

---

[72] TPO, pág. 262, línea 24.
[73] TPO, pág. 263, líneas 4-10.
[74] TPO, pág. 263, líneas 21-24.
[75] *Exhibit 1.*
[76] *Íd.*, pág. 2.
[77] *Íd.*, pág. 3.
[78] *Íd.* (Traducción suplida). El documento lee: "Patient has a small lesion on labia minora, which is suggestive of possible abuse, but could also be due to other factors."
[79] *Íd.*
[80] TPO, pág. 274, líneas 8-11.

el momento, o sea, como intervención de sala de emergencias, no entendía que era necesario".[81] También respondió, a preguntas del tribunal, que "[e]n ese momento, o sea, como parte de la evaluación en sala de emergencias, ¿verdad? de forma de emergencias, no entendía que era necesaria una evaluación en ese momento".[82] El juez le replicó "¿Pero usted en ese momento no entendía que era necesario a base de los hallazgos?", ante lo cual la Dra. Licha contestó "[l]a paciente, en realidad, el examen físico no indicaba nada que necesitara una evaluación más profunda".[83]

Mientras aún estaba en el Hospital, el 22 de octubre de 2023, llegó la agente Bernice Acevedo Morales (agente Acevedo Morales), agente investigadora asignada al caso.[84] Entre las entrevistas que realizó, la Agente entrevistó a la menor. Esta entrevista quedó plasmada en el *Informe de Investigación*, el cual fue preparado el mismo día.[85] En las notas de dicha entrevista, se lee:

> Habían [*sic*] días que [JNFC] estaba sola en el cuarto de abuela viendo muñequitos y sus hermanos se quedaban en la sala viendo televisión con su abuela y Rub[é]n se metía en el cuarto donde estaba [JNFC] sola y la besaba en la boca introduciéndole la lengua y le quitaba su pantalón y el panty y le tocaba su vulva y le metía sus dedos por la vulva y le dolía, también Rub[é]n le pasaba su lengua por la vulva y [JNFC] le decía a Rub[é]n que parara pero Rub[é]n seguía. Otro día Rub[é]n se metió al cuarto donde estaba [JNFC] le quitó su pantalón y panty, la besó en la boca, le tocó su vulva y se trató de meter su pene por el ano y le dolió mucho que lo empujó, esto pasó dos veces. Otro día Rub[é]n se quitó su correa, su pantalón y le mete su pene a la boca de [JNFC]. Rub[é]n se desvestía y vestía frente a [JNFC].[86]

De las notas también se detalla otra ocasión en que Rubén entró al cuarto, se masturbó e introdujo el pene en la boca de la menor, dónde eyaculó.[87] También detallan las notas que "Rubén le besaba las nalgas y le metía la lengua en su ano y le trató de meter

---

[81] TPO, pág. 276, líneas 13-15.
[82] TPO, pág. 277, líneas 7-15.
[83] TPO, pág. 277, líneas 21-24; pág. 278, líneas 1-2.
[84] TPO págs. 365-367.
[85] *Exhibit 3*.
[86] *Íd.*, pág. 4.
[87] *Íd.*, pág. 5.

su pene por el ano".[88] Finalmente, las notas recogen unas preguntas particulares que la agente Acevedo le hizo a la menor, entre las cuales están las siguientes:

> "P:  [¿] Cómo te sentías cuando te hacía eso?
>
> R:  Asustada porque no me gustaba y no era la primera vez que me lo hacía".[89]

También le preguntó la agente:

> "P:  [¿] Alguien más te hace lo que te hace Rub[é]n?
>
> R:  **No, solo Rubén**".[90]

Además de entrevistar a la menor, la agente Acevedo Morales entrevistó también al apelante. Según su testimonio en sala, el apelante la había narrado a esta que, la noche del 21 de octubre de 2023, su entonces pareja Idalia, había salido con sus nietos al supermercado, y que cuando estos regresaron, al poco tiempo llegó Ninoshka.[91] Lo que el apelante le narró sobre qué sucedió luego—tanto que Ninoshka hablara aparte con la menor, como que la menor lo confrontara en el cuarto—corroboró lo narrado por Idalia y Ninoshka.[92] Además, como parte de su interrogatorio, la agente Acevedo indagó sobre si el apelante había estado a solas con la menor en un cuarto. Su respuesta, según testificado por la agente, fue como sigue:

> [........]
> [S]e le hace[n] varias preguntas, que si él... que si él ha entrado al cuarto solo mientras estaba J[NFC], me dice que sí, pero que entra rápido y sale. Le pregunto que si la puerta estaba abierta y me dice que a veces la cierra, pero la cierra cuando... para que el aire... cuando el aire está prendido, para que no salga el aire, que él ajunta [*sic*] la puerta, busca lo que va a buscar y sale. Según él, ¿verdad?, que nunca estaba solo con la menor en el cuarto, pero que de vez en cuando sí él entraba y salía al cuarto, y la nena estaba en la cama, con la tableta.[93]

---

[88] *Íd.*

[89] *Íd.*

[90] *Íd.* (Énfasis suplido).

[91] TPO, pág. 385. El testimonio de Rubén a los efectos que Idalia fue al supermercado con los menores la noche del 21 de octubre de 2023, corrobora lo testificado por la Sra. Idalia Cosme durante el juicio; *véase* TPO pág. 102.

[92] TPO, págs. 385-387.

[93] TPO, pág. 387, líneas 7-20.

Esta entrevista con el apelante también quedó plasmada en el *Informe de Investigación.*[94] Particularmente, cabe destacar el siguiente intercambio que recoge el informe:

> "P:   [¿]Usted se ha metido al cuarto de usted mientras [JNFC] está viendo muñecos o en su tablet?
>
> R:   Sí, he entrado a buscar algo pero salgo rápido
>
> P:   [¿]Usted cierra la puerta del cuarto?
>
> R:   Solo cuando se va a usar el aire acondicionado".[95]

Hasta ahí llega el recuento de los hechos particulares que dieron pie a las denuncias, las cuales desembocaron en el caso ante nos. No obstante, es meritorio resaltar otra prueba que se presentó en el juicio.

En primer lugar, del testimonio de Idalia surge que, esta cuidaba a sus nietos en intervalos de aproximadamente dos a tres semanas, y que solían quedarse los fines de semana.[96] Cuando se quedaban con ella, Idalia testificó que los niños, o veían televisión con ella, o jugaban con su tableta en su cuarto.[97] Idalia también testificó que, cuando los menores estaban en la casa, solía estar también el apelante, y en raras ocasiones, su hijo Luis, quien vivía con ella.[98] A su vez, indicó que el apelante se encontraba "a veces él acostado en el cuarto … o a veces en la sala".[99]

Relevante al recurso ante nos, Idalia testificó que: "[b]ueno, nos pasábamos en la sala, **pero había momentos en que yo me quedaba dormida o algo y cuando venía a ver, pues o ella estaba en el cuarto bregando con la *tablet*…** Así".[100] Este detalle corrobora el testimonio de la menor, en cuanto a que era agredida

---

[94] *Exhibit 3*, págs. 3-4.
[95] *Íd.*, pág. 3.
[96] TPO, pág. 109
[97] *Íd.*
[98] TPO, pág. 112, líneas 2-9.
[99] TPO, pág. 117, líneas 9-16.
[100] TPO, pág. 149, líneas 15-22 (énfasis suplido).

en el cuarto, mientras que los demás familiares se encontraban en la sala.

En segundo lugar, durante el juicio también testificó Luis R. Otero Cosme, tío de la menor, quien vivía en la residencia del apelante para el 21 de octubre de 2023. Luis advino en conocimiento de los hechos posteriormente, por voz de Idalia Cosme. Esto quiere decir que, ni tenía conocimiento personal, ni habló con la menor sobre lo sucedido.[101]

Dentro de su testimonio, el señor Otero narró que cuando los menores se quedaban en casa de Idalia, estos dormían en el cuarto de ella.[102] Pertinente a la controversia de este caso, el señor Otero Cosme testificó que, en algunas ocasiones, los nietos se quedaban a solas con el apelante, aunque sucedía mínimamente.[103]

En el contrainterrogatorio, el señor Otero Cosme testificó que, en muy pocas ocasiones, él se quedaba a cargo del cuidado de los menores, y que, en otras, se quedaba a cargo el apelante.[104] No obstante, más adelante en el contrainterrogatorio, el señor Otero Cosme afirmó que la menor no se quedaba solo con él.[105]

De lo destacado hasta el momento, surge del expediente que se probaron todos los elementos de los delitos imputados. Los elementos de la agresión sexual, bajo el artículo 130(a), *supra,* son: un acto orogenital o de penetración sexual ilegal con una víctima menor de dieciséis (16) años. Surge del testimonio de la menor—el cual quedó plasmado en dos documentos separados y corroborado por los testimonios de los familiares que estuvieron con ella para esas fechas—que el apelante, con conocimiento de la edad de la menor, le realizó y provocó que JNFC realizara actos sexuales orogenitales y la penetró digitalmente. Específicamente, el apelante

---

[101] TPO, pág. 217, líneas 14-17.
[102] TPO, pág. 170, 174.
[103] TPO, págs. 178-180.
[104] TPO, pág. 211, líneas 6-24.
[105] TPO, pág. 213.

cometió este delito cuando (a) introdujo su pene en la boca de la menor, provocándola a realizar el acto orogenital, y (b) todas las veces que la penetró con sus dedos y le pasó la lengua por el área genital, haciendo este el acto orogenital. Quedó probado también que, al momento de los hechos, JNFC era menor de dieciséis (16) años.

El apelante señala como defecto, que no hay prueba corroborativa pericial. Esto, porque el testimonio de la Dra. Licha Soler no pudo establecer con claridad que la lesión presente en la menor era causada por abuso sexual.[106] No obstante, nuestro Tribunal Supremo estableció que no se requiere evidencia corroborativa del testimonio de una víctima de agresión sexual, sino que basta su propio testimonio. *Com. Asuntos de la Mujer v. Srio,* supra. Por otro lado, el Alto Foro ha expresado que la agresión sexual se puede demostrar más allá de duda razonable mediante otro tipo de prueba, **como las declaraciones de la víctima a sus familiares en tiempo contemporáneo a los hechos, así como otros testimonios de corroboración ofrecidos**. *Pueblo v. Pérez Rivera*, supra, pág. 317.

En este caso, hubo testimonio de tres familiares que hablaron con la víctima en tiempo contemporáneo a los hechos, y sus testimonios se corroboran entre sí. A su vez, las declaraciones de la menor quedaron grabadas en los informes, tanto de la Dra. Licha Soler, como la agente Acevedo Morales. Esta prueba, en conjunto con el propio testimonio de la menor en el juicio, establece, más allá de duda razonable, que el apelante cometió el delito de agresión sexual.

Cabe señalar que, la prueba desfilada demostró en varias instancias durante el juicio, que el apelante gozaba de una buena

---

[106] *Exhibit 1*.

relación con todos los miembros de la familia.[107] Este dato de por sí, es insuficiente para minar la credibilidad de los testimonios vertidos. Por otro lado, la defensa intentó insinuar que otros adultos, específicamente, el señor Luis Otero Cosme, tuvieron acceso a la menor en el periodo imputado.[108] No obstante, la menor fue clara en su declaración a la agente Acevedo Morales, respecto a que **solamente** el señor Reyes Rivera le hacía las cosas que no le gustaban.[109]

En virtud de lo anterior, colegimos que, la prueba desfilada en el juicio resulta suficiente para fundamentar la determinación del foro primario, y no hallamos en su curso de acción que hubiera mediado pasión, perjuicio, parcialidad o error manifiesto.

Por otra parte, el foro primario encontró al apelante culpable de cometer el delito de actos lascivos. Los elementos de este delito son: (1) que se someta a una persona a un acto que tienda a despertar, excitar o satisfacer la pasión o deseo sexual del imputado, (2) sin que haya intención de cometer el delito de agresión sexual, (3) y que la víctima sea menor de 16 años, art. 133(a), *supra*.

Una mirada inicial a la prueba pudiera generar la duda sobre si, de los hechos descritos y probados, hubo instancias en donde el apelante hubiera sometido a la menor a actos que tendiesen a despertar el deseo sexual **sin la intención de penetrarla**, tal y como requiere el artículo 133. Esto debido a que, en múltiples ocasiones, los hechos delictivos se describieron en conjunto. No obstante, de la totalidad del expediente, se pueden apreciar instancias donde las actuaciones del imputado configuraron el delito de actos lascivos, y no el de agresión sexual.

---

[107] TPO, págs. 144-145, pág. 357, pág. 513.
[108] TPO, pág. 215.
[109] *Exhibit 3*, pág. 5.

Por ejemplo, del *Informe de Investigación* surge que "Rub[é]n se desvestía y vestía frente de [JNFC]".[110] Por otro lado, la Dra. Licha Soler testificó que la menor le dijo que el apelante en ocasiones se desnudaba frente a ella.[111] El reporte médico también establece que el apelante la besaba en la boca, asunto que le causaba disgusto.[112] A esos fines, la menor testificó que "él me besaba y también ponía su lengua... su lengua en mi ano".[113]

Estos actos se pueden catalogar como actos dirigidos a satisfacer la pasión sexual. Estos se describieron aparte de, y como hechos distintos a los demás. En otras instancias descritas, los actos coetáneos claramente demostraron la intención de cometer el delito de agresión sexual. Tal era el caso de cuando, por ejemplo, "le besaba las nalgas y le metía la lengua en su ano y le trato [*sic*] de meter su pene por el ano".[114] En el ejemplo acabado de describir, el acto de besarle las nalgas a la menor sería también catalogado como un acto lascivo, de no ser acompañado por el intento de penetración anal, lo cual denota, sin lugar a dudas, la intención de cometer una agresión sexual.

El foro primario, luego de justipreciar, tanto la prueba testifical como documental, creyó que, además de haberse cometido el delito de agresión sexual, hubo prueba que estableció que también se cometió el delito de actos lascivos. Luego de examinar la totalidad de la prueba presentada en este juicio, y los autos originales de este caso, concluimos que no estamos en posición para alterar la determinación realizada por el foro *a quo*.

**IV**

Por los fundamentos que anteceden, se *confirma* la *Sentencia* apelada.

---

[110] *Exhibit 3*, pág. 4.
[111] TPO, pág. 261, líneas 11-16.
[112] *Exhibit 1*, pág. 1.
[113] TPO, pág. 484, líneas 10-11.
[114] *Exhibit 3*, pág. 5.

Notifíquese a las partes, al Procurador General y al Secretario del Departamento de Corrección y Rehabilitación. El Administrador de Corrección deberá entregar copia de esta *Sentencia* al confinado, en cualquier institución donde este se encuentre.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones